(927 P.2d 958)
No. 74,885

WILLIAM F. GRIFFIN, *Appellant*, v. DODGE CITY COOPERATIVE EXCHANGE, *et al.*, *Appellee*.

Opinion filed November 27, 1996.

*David O. Alegria,* of Topeka, for appellant.

*Stephen M. Kerwick* and *David J. Rebein,* of Wichita, for appellee.

Before BRAZIL, C.J., PIERRON, J., and DAVID F. BREWSTER, District Judge, assigned.

BRAZIL, C.J.: William F. Griffin, plaintiff/appellant, appeals from the entry of summary judgment in favor of his former employer, defendant Dodge City Cooperative Exchange, on his claim of retaliatory discharge and intentional infliction of emotional distress. We affirm.

Griffin began working for Dodge City Cooperative Exchange (Exchange) in October 1985. His job was as an equipment operator whose main duty was to operate a big rig which sprayed herbicides and pesticides on farm fields. During the winter months, Griffin performed various maintenance duties. He testified that he spent 75% to 90% of his time operating equipment and the remaining 10% to 25% performing maintenance on equipment.

In 1991, Griffin sustained an injury while driving a sprayer. He hurt his knee, thigh, elbow, and back. Griffin returned to work the next day and continued working for about a month, when the pain from his injuries became severe. Griffin consulted a physician, and he was ultimately diagnosed with degenerative disc disease which was made symptomatic by the accident.

He was released to return to work in November 1991, with significant physical restrictions limiting lifting, sweeping, stooping, bending, crawling, and driving. Griffin reported to the Ensign grain elevator, where he was assigned to clean the elevator with an air hose; he had performed this job for 3½ days when a supervisor at Exchange sent him home because of his physical restrictions. The record indicates that this was not a job that someone performed every day and was not a permanent position.

In March 1992, Griffin was released from his doctor's care, but permanent restrictions were imposed. Those restrictions were "[d]riving about 2 [hours] at a time, with frequent breaks, no sweeping or shoveling, lifting up to 50 [pounds], limited bending and stooping. No driving on rough terrain, no bumpy roads, no driving heavy equipment." Griffin admitted that if he obeyed his doctor's restrictions, he could not operate and maintain the big rigs he worked on prior to his injury. By his own estimate, Griffin could perform only 5% to 10% of the job duties he was performing prior to his injury.

There was evidence that in April and May 1992, Griffin discussed the possibility of performing other work for Exchange at a Farm and Home store and then at a service station (referred to as the Cardtrol position). The job at the Farm and Home store required the stocking of shelves, dusting off products, picking up trash, cleaning the parking lot, and washing store windows. Griffin admitted that some of those duties could not be performed within his job restrictions. In his workers compensation deposition, Griffin testified he was offered this job, but could not take it because of the medical restrictions. Griffin also discussed the duties of a Cardtrol service station attendant, but he admitted he could not perform all of the duties in that position because of his restrictions. Griffin was terminated by Exchange on May 31, 1992.

At some point in time, Griffin filed a workers compensation claim, asserting that he had sustained a permanent disability, and sought benefits for a work disability rather than a functional disability. Exchange contested the claim by asserting that Griffin's degenerative disc disease was not work-related and not permanent. The claim was apparently vigorously litigated by the parties.

We have little information about the workers compensation claim. However, our records contain the decision of the administrative law judge (ALJ) and the district court. The ALJ issued a decision finding that Griffin was entitled to workers compensation benefits based upon a 46% permanent partial general disability as a result of a 46% work disability.

Exchange appealed that determination to the district court, arguing, in part, that Griffin's injury preceded the work accident in question and that there was no permanent impairment. On review, the district court upheld the ALJ's decision in its entirety. The district court made the specific finding that "[c]laimant did not return to his former job and was unable to work in Respondent's retail store or Cardtrol gas station."

Exchange appealed the district court's decision to this court, which was docketed as case No. 70,595. Griffin did not file any cross-appeal. The appeal was voluntarily dismissed by Exchange on April 20, 1994, because the case had been resolved with Griffin. Griffin testified that he received a lump sum settlement for $45,000 as part of that settlement. There is no indication that the district court's judgment was modified or vacated as a result of the settlement.

On May 23, 1994, Griffin filed the present action, asserting that Exchange terminated his employment in retaliation for his pursuing a workers compensation claim, and also asserted a claim for the tort of intentional infliction of emotional distress. In its answer, Exchange denied Griffin's claims. Exchange asserted that Griffin's claims were barred by the statute of limitations, as well as by an accord and satisfaction, waiver, and estoppel as a result of his workers compensation claim.

After the close of discovery, Exchange filed a motion for summary judgment on both of Griffin's claims. Griffin filed a response

controverting portions of three of Exchange's paragraphs of uncontroverted facts. Replies and surreplies were filed by both parties. Following a hearing, the district court entered an order granting Exchange's motion in its entirety. The findings of fact set forth in the court's order were identical to the statement of uncontroverted facts set forth in Exchange's motion. The district court found (1) plaintiff could not perform the position he held prior to his injury; (2) assuming Kansas law required Exchange to attempt to find another position for Griffin, no such work was available which Griffin could perform; (3) Exchange had bona fide business reasons for terminating Griffin's employment; and (4) Griffin had failed to present sufficient evidence to meet the threshold requirement of an intentional infliction of emotional distress claim. Griffin then filed a timely notice of appeal.

On appeal, Griffin argues that summary judgment was improper because he was "ready, willing and able" to resume his job of driving the chemical sprayer. Griffin concedes that his doctor's physical restrictions precluded him from performing most of the duties of that position. However, Griffin cites to his 1994 deposition testimony where he indicated that he did not know whether he could perform his old job because he never tried. Based upon this testimony, Griffin argues that he was "willing and capable of working beyond his restrictions." Griffin also argues that "the final analyst of his/her ability to work is the individual employee."

Griffin's argument is unacceptable for several reasons. First, Griffin did not raise this argument before the district court. In his response to Exchange's summary judgment motion, Griffin only argued that he was "ready, willing and able" to perform the Cardtrol job and the Farm and Home job, and to work at the Ensign facility (cleaning the elevator). Nor was such an argument raised in Griffin's surreply to the summary judgment motion. "'A point not presented to the trial court will not be considered for the first time on appeal.' [Citation omitted.]" *In re Marriage of Ray*, 21 Kan. App. 2d 615, 620, 905 P.2d 692 (1995).

In addition, Griffin's argument, at best, stretches the limited deposition testimony he gave on this point. Griffin only testified that he did not try to return to his old job and that he did not know

if he could do it. This is a far cry from establishing that he ever advised Exchange that he was "ready, willing and able" to do the job or that Exchange refused to allow him to return to that job.

Plaintiff argues that he should have been allowed to return to his former job (assuming that he ever asked to be allowed to return), notwithstanding that the job required activity clearly in violation of his doctor's physical restrictions. This argument is made even though Griffin testified that he understood that Exchange was bound by his doctor's restrictions. Griffin even contacted his doctor's office about lifting or changing those restrictions. Nothing in the record shows that the doctor changed or was willing to change those restrictions.

Griffin relies on K.S.A. 44-510c(b)(2) to support his argument that an employee should be allowed to decide whether to return to a job beyond his restrictions. K.S.A. 1992 Supp. 44-510c(b), which was in effect at the time of Griffin's injury, stated, in relevant part:

"(2) Temporary total disability exists when the employee, on account of the injury, has been rendered completely and temporarily incapable of engaging in any type of substantial and gainful employment. *A release issued by a health care provider with temporary medical limitations for an employee may or may not be determinative of the employee's actual ability to be engaged in any type of substantial and gainful employment.*" (Emphasis added.)

Griffin relies on the last sentence to establish that he "had a legal right to work beyond his restrictions if he was capable of doing so." This statutory language, however, is clearly limited to the purpose of determining *whether* an employee has a "[t]emporary total disability" for purposes of receiving benefits, *i.e.*, whether he is capable of "engaging in any type of substantial and gainful employment." K.S.A. 1992 Supp. 44-510c(b)(2). Under this provision, the fact that a physician has released the employee with restrictions does not automatically establish that the employee is or is not capable of engaging in any type of employment.

Nothing in the statute indicates that an employer can force an employee, or an employee can elect, to return to a position beyond his or her medical restrictions. Both parties have the option of seeking medical evaluation by a neutral physician if they believe

that the treating doctor's restrictions or treatment is inappropriate. K.S.A. 1992 Supp. 44-516.

Griffin cites to nothing in the Workers Compensation Act which *requires* an employer to return an employee to work clearly beyond his medical restrictions. To do so would require the employer to expose the employee to a situation which may well likely exacerbate his or her injury and open the employer (and/or the workers compensation fund) to additional liability. Moreover, it would not be unreasonable to assume that permitting an employee to work beyond his or her restrictions might lead to more serious injuries which would totally incapacitate the employee for an extended period or for the rest of his or her life. Such a contention is inconsistent with the purposes of the Workers Compensation Act.

Griffin next argues that Kansas law prohibits an employer from firing an employee with a work-related injury unless the employee is "incapable of performing the duties of *any jobs* available to him based upon his physical restrictions." Griffin contends that he could work at the Farm and Home store, at the Cardtrol station, and at the Ensign facility.

Because Griffin admitted that he could do only portions of the various positions in question, he is essentially arguing that the Exchange was required to modify one or more jobs to accommodate his limitations.

Exchange argues that Kansas law does not require the employer to retain an employee who, because of a work-related injury, cannot do his or her regular job. Further, Exchange argues that requiring employers to attempt to accommodate all injured workers or face a retaliatory discharge claim would force employers "to 'featherbed' its work force with uneconomical 'make work' jobs or deny positions to qualified individuals to allow for workers compensation veterans not able to do the job."

Both parties rely on *Rowland v. Val-Agri, Inc.*, 13 Kan. App. 2d 149, 766 P.2d 819 (1988). In *Rowland,* the plaintiff sustained a work-related injury which prevented him from returning to the position he held at the time of the injury. At the time, the employer did not have any light duty jobs available and the employee remained off work. The employer had a company policy of termi-

nating all employees who were gone for any reason for more than 6 months. Defendant gave plaintiff notice that his 6 months were about up and he needed to return to his old job. When he did not, the company terminated his employment. 13 Kan. App. 2d at 150.

Rowland sued, claiming that the defendant had terminated him in retaliation for asserting his rights under the Workers Compensation Act. After discovery closed, the district court granted the employer's motion for summary judgment because the employer had no duty to retain "an employee who cannot do the work the employer has available." 13 Kan. App. 2d at 151. Throughout the opinion in *Rowland*, however, the court alternates between discussing "his or her work" and "available work."

The confusion regarding the issue of whether there is a duty to determine if other positions are available arises primarily from two parts of the *Rowland* opinion. The syllabus states:

"When a discharged employee is not capable of performing the duties of his or her job because of a work-related injury and the termination of that employee's workers' compensation claim is not a condition of his or her reemployment, *but another position cannot be found which the employee can fill*, the employee does not have a tort action for retaliatory discharge against his or her former employer." (Emphasis added.) 13 Kan. App. 2d 149, Syl. ¶ 4.

The language in *Rowland* referencing the availability of other positions with the employer was a reference to the facts in that particular case where it appeared the employer considered Rowland for light duty work but no positions were available. We do not read this language to require an employer to look for alternative work or create a position before terminating an injured employee who clearly cannot return to his prior position. While efforts to reemploy or retain injured workers should be encouraged, the Workers Compensation Act does not impose such an *obligation* on an employer. Likewise, our reading of *Murphy* and *Coleman* reinforce the view that an employee who cannot return to his or her former position does not have a retaliatory discharge claim.

Some of the Kansas federal district courts have interpreted *Rowland* broadly. Their broad interpretation of *Rowland* finds that the public policy under the Workers Compensation Act requires that an employer may be held liable for retaliatory discharge—regard-

less of whether the employee can perform his or her original job—unless the employer "reasonably" attempts to accommodate the employee to an extent similar to that now required under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (1994) (ADA) and the Kansas Acts Against Discrimination, K.S.A. 44-1001 *et seq.* (KAAD). We note that the ADA did not go into effect for large employers until July 26, 1992, shortly after Griffin's termination. *Smith v. Midland Brake, Inc.*, 911 F. Supp. 1351, 1361 (D. Kan. 1995).

The KAAD provisions requiring "reasonable accommodations" to employees with disabilities went into effect on July 1, 1991, prior to Griffin's termination. L. 1991, ch. 147, §§ 2, 23. Although the KAAD amendments were in effect at the time Griffin was terminated, nothing in the record indicates that Griffin filed any charge of discrimination with the Kansas Human Rights Commission as required by K.S.A. 1992 Supp. 44-1005(a).

We must determine whether Kansas public policy, as derived from the Workers Compensation Act, *requires* employers to attempt to find alternative employment and/or modify job functions to accommodate workers injured on the job before terminating them. Kansas appellate courts have recognized that the Workers Compensation Act is structured to provide an incentive for employers "to rehabilitate the worker or accommodate the worker's disabilities." *Hughes v. Inland Container Corp.*, 247 Kan. 407, 416, 799 P.2d 1011 (1990). The second injury fund was created, in part, to encourage employers to hire and retain employees who previously sustained injuries or had disabilities. *Miller v. Miller*, 13 Kan. App. 2d 262, 265, 768 P.2d 308 (1989).

Likewise, an employer who accommodates an injured employee, especially if the accommodated position pays comparable wages, can benefit under the Workers Compensation Act. This benefit arises not only by retaining an experienced employee, but also by the potential that the employer's liability for workers compensation benefits can be reduced. For example, an employee placed in an accommodated position with a comparable wage must overcome the statutory presumption that he or she has no *work* disability under K.S.A. 44-510e(a) and would generally be limited to benefits

based upon his or her *functional* disability. See, *e.g.*, *Lee v. Boeing Co.*, 21 Kan. App. 2d 365, 899 P.2d 516 (1995); *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 284, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995); *Elliff v. Derr Constr. Co.*, 19 Kan. App. 2d 509, 875 P.2d 983 (1993).

However, the fact that the Workers Compensation Act *encourages* employers to rehabilitate and accommodate injured employees does not alone impose a legal duty on the employer to make such an accommodation or be subjected to a tort action for wrongful discharge. Had the legislature intended to *mandate* that employers accommodate injured employees, it could easily have included language similar to that now contained in the KAAD and the ADA into the Workers Compensation Act.

Moreover, if a duty to accommodate is made part of the public policy which supported the creation of the tort of retaliatory discharge, the policies under the KAAD would be undermined. Under the KAAD, employees claiming unlawful employment practices are required to file charges of discrimination with the KHRC. K.S.A. 1995 Supp. 44-1005(a). Those claims are then investigated by the agency, and if probable cause is found, the agency attempts to resolve the dispute by conference and conciliation. K.S.A. 1995 Supp. 44-1005(c)-(e). Exhaustion of administrative remedies under the KAAD is mandatory prior to bringing a civil action for claims of unlawful employment discrimination. *Simmons v. Vliets Farmers Co-op Ass'n*, 19 Kan. App. 2d 1, 4, 861 P.2d 1345, *rev. denied* 253 Kan. 861 (1993). The entire structure of the KAAD would be bypassed if a worker can make a failure to accommodate claim in a retaliatory discharge case instead of complying with the requirements of the KAAD.

This case is an example of the problem in interpreting *Rowland* broadly. Such an interpretation, to some extent, encourages employees to pursue substantial workers compensation awards and then file a tort claim based upon retaliatory discharge. The unfairness of this "double recovery" was recognized in *Rowland*.

For these reasons, we would construe the ruling in *Rowland* to state that the public policy creating the tort of retaliatory discharge does not *require* employers to consider or find alternative employ-

ment for an injured employee who is unable to return to his or her former position. While the Workers Compensation Act is designed to encourage employers to make such accommodations, an employer cannot be sued for retaliatory discharge simply because it failed to consider another position or to modify a job to accommodate an injured employee.

If an employee seeks to pursue a claim for failure to accommodate, he or she should pursue that claim under the KAAD or the ADA and exhaust the administrative remedies under those statutory schemes.

Finally, Griffin argues that Exchange is collaterally estopped from taking the position that he was unable to perform work for it. He argues that Exchange took a contrary position in two administrative proceedings—an unemployment compensation case and the workers compensation case. Exchange contends that "if any party should be tied to its litigation position in the workers compensation case, that party is Griffin" and that the principle of collateral estoppel is "more readily and appropriately applied against plaintiff."

The record reflects that Exchange contested Griffin's claim for unemployment compensation and workers compensation. In responding to Griffin's apparent claim for unemployment compensation, Exchange indicated that it had made a job offer to Griffin on May 5, 1992, for the service station job and that Griffin refused the job because "[h]is doctor would not lift his physical restrictions." The Farm and Home store also submitted a document indicating that it had offered Griffin a position of stocking clerk on April 20, 1992, and that he refused the position because of the doctor's physical restrictions. However, there is no information in the file to determine the outcome of the unemployment compensation proceeding. Therefore, it is unclear whether the Department of Human Resources accepted or rejected Exchange's position on this matter.

As discussed above, Exchange also contested Griffin's workers compensation claim. In its brief before this court, Exchange argued that the evidence did not establish that Griffin's injury and disability "[arose] out of and in the course of" his employment with

Exchange and that Griffin's injury was only temporary. As indicated above, however, both the ALJ and the district court ruled in *Griffin's* favor in assessing a 46% work disability. The district court specifically found that Griffin could not perform any of the available positions at Exchange.

" ' "The doctrine of collateral estoppel may be invoked as a bar to litigating an issue when the following is shown: (1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue, based upon ultimate facts as disclosed by the pleadings and judgment; (2) the parties are the same or in privity; and (3) the issue was actually determined and was necessary to support the judgment." ' " *Gigot v. Cities Service Oil Co.*, 241 Kan. 304, 311, 737 P.2d 18 (1987).

In this case, the parties do not dispute that they are the same or in privity with the parties in the workers compensation case and the unemployment compensation case. Griffin fails to discuss the remaining two elements of collateral estoppel as to these prior proceedings. Nothing in the record reflects that the issue of Griffin's ability to work was ever determined in the unemployment compensation proceeding. Therefore, there is no basis to find that the issue is subject to collateral estoppel as a result of that litigation.

The issue of collateral estoppel is clearer in connection with the workers compensation proceeding. Our records include the judgments entered by the ALJ and the district court in that proceeding. Those orders indicate that both the district court and the ALJ addressed the issue of Griffin's ability to perform the alternative jobs at the Farm and Home store and at the Cardtrol station was litigated and decided. The final judgment of record in that case—the decision of the district court—specifically found that "[Griffin] did not return to his former job and was unable to work in Respondent's retail store or Cardtrol gas station." Griffin did not appeal from that finding. Therefore, there is a final judgment on the issue.

Finally, the issue of Griffin's capacity to work those jobs was necessarily decided as part of the workers compensation claim. Griffin was apparently claiming permanent partial disability as a result of his work-related injury and was asking that his claim be based upon a work disability rather than a functional disability. The provisions of the Workers Compensation Act in effect at the time

of his injury determined the extent of benefits for permanent partial general disability as follows:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced, taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general disability shall not be less than percentage of functional impairment. Functional impairment means the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence. There shall be a presumption that the employee has no work disability if the employee engages in any work for wages comparable to the average gross weekly wage that the employee was earning at the time of the injury." K.S.A. 1992 Supp. 44-510e(a).

Under this provision, an injured worker is presumed to be entitled only to compensation based upon his or her functional impairment unless he or she establishes a work disability. If an employee engages in, *or is capable of engaging in any* work for comparable wages, there is a presumption of no work disability. *Foulk v. Colonial Terrace*, 20 Kan. App. 2d at 284. Based upon the standards set forth in K.S.A. 1992 Supp. 44-510e(a), the district court's finding that Griffin was incapable of performing any of the positions at Exchange was a significant and necessary finding to support the substantial work disability award given to him.

Griffin's estoppel arguments are more based on the concept of judicial estoppel. The concept of judicial estoppel was discussed in *McClintock v. McCall*, 214 Kan. 764, 522 P.2d 343 (1974). "The general theory of judicial estoppel or estoppel by oath . . . is that a party is bound by his judicial declarations and may not contradict them in a subsequent action involving the same parties *if one party has changed position in reliance on such declarations*. [Citation omitted.]" (Emphasis added.) 214 Kan. at 766. Judicial estoppel is not applicable in this case, however, because Griffin did not present any evidence that he changed his position in reliance on Exchange's arguments in the prior proceedings. Because Griffin prevailed in the prior proceeding, it is incongruous for him to assert that he somehow changed his position to his detriment.

A type of judicial estoppel or collateral estoppel has been applied in retaliatory discharge cases against *employees* who make inconsistent claims. For example, in *Smith v. Midland Brake, Inc.*, 911 F. Supp. at 1355, a terminated employee sued his former employer for handicap discrimination and retaliatory discharge. After his termination, the plaintiff applied for and ultimately received social security disability benefits. His receipt of such benefits was based upon a determination that he was unable to " 'engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment.' " 911 F. Supp at 1359. Based upon this finding, the district court granted summary judgment to the employer on all the claims. 911 F. Supp. at 1362-63. *Cf. Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 555-56 (D. Kan. 1995) (employee who claimed and received long-term disability and social security benefits could not prevail on ADA claim by arguing she could perform her job despite her disability).

For these reasons, Griffin's argument that Exchange was collaterally or judicially estopped from alleging he could not perform the positions in question must be rejected. Moreover, the record before this court shows that a final judgment was entered in the workers compensation case which included judicial findings of fact which are contrary to Griffin's position in this case. If collateral/judicial estoppel applies to anyone, it should bar Griffin from relitigating the "ability to work" issue.

In granting summary judgment to Exchange, the district court found that Griffin had failed to present sufficient evidence to meet the threshold requirement of a claim of intentional infliction of emotional distress. Griffin does not address this claim in his brief. Therefore, this issue is deemed abandoned. See *Pope v. Ransdell*, 251 Kan. 112, 119, 833 P.2d 965 (1992); *In re Guardianship & Conservatorship of Heck*, 22 Kan. App. 2d 135, 146, 913 P.2d 213 (1996).

For these reasons, we affirm the district court's ruling that Griffin could not return to his regular position at Exchange and, therefore, had no claim for retaliatory discharge. Likewise, the district court correctly rejected Griffin's estoppel arguments.

Affirmed.