**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 15 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BENARD WITHERSPOON,

      Plaintiff - Appellant,

      v.

NASH-FINCH COMPANY,

      Defendant - Appellees.

No. 97-3097
(D. Ct. No. 95-1128-MLB)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **TACHA, McWILLIAMS,** and **KELLY,** Circuit Judges.

      Plaintiff Benard Witherspoon brought an action under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, alleging discriminatory harassment and termination of employment based on race. Plaintiff also claims wrongful retaliation for filing a worker's compensation claim, in violation of Kansas public policy. The United States District Court for the District of Kansas granted summary judgment to defendant with respect to all counts except for plaintiff's

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Title VII claim that Nash-Finch discriminated against him on the basis of race by failing to accommodate his injury, which eventually led to his discharge. The remaining claim proceeded to trial. The jury returned a verdict for defendant. Plaintiff appeals the district court's summary judgment ruling and also asserts that the court erred in the issuance of the jury instructions on the count that went to trial. We take jurisdiction under 28 U.S.C. § 1291 and affirm.

## Background

Defendant Nash-Finch Company is a wholesale grocery distributor that operates a distribution warehouse in Liberal, Kansas. Plaintiff Benard Witherspoon, an African-American, began employment at the warehouse in July 1976. His primary position was as a selector. Selectors fill customer orders by physically obtaining the goods from the warehouse. The selector position is physically demanding because it requires frequent lifting (in excess of fifty pounds), bending, twisting, and stooping.

In 1989, Nash-Finch implemented a computerized assessment system to measure work productivity called the Gagnon system. The Gagnon system measures productivity as a percentage by comparing the amount of time a selector spends filling an order with the benchmark time established by Nash-Finch for completion of that order. In May 1992, Nash-Finch began requiring its employees to maintain a bi-weekly minimum average of ninety percent productivity. Nash-

-2-

Finch used a progressive disciplinary policy to address low production.

Prior to 1993, Witherspoon had an exemplary work record. He had failed to meet required production levels only one or two times prior to February 1993, and on many occasions, he exceeded the Gagnon standards by more than five percent. On February 22, 1993, the labor standards coordinator at the warehouse, Gene Carter, issued a verbal warning to Witherspoon, advising him that he had failed to meet the production requirement for the preceding bi-weekly period. Prior to this incident, Carter had described Witherspoon's record as excellent. The same day, Witherspoon injured his back while selecting. On March 8, Witherspoon went to Nash-Finch's designated doctor, Jack Reese, who placed Witherspoon on a two-day medical restriction prohibiting him from heavy lifting.

In subsequent appointments, Dr. Reese refused to examine Witherspoon and was verbally abusive, saying that Witherspoon was lazy, did not want to work, was cheating Nash-Finch, and had the body of a man but the mind of a three-year old. Dr. Reese was similarly abusive to white employees. Later in March, Witherspoon reinjured his back. Following this injury, Witherspoon presented Rick Hoy, then the warehouse superintendent, with a note from a private physician indicating that he needed two weeks off of work for therapy. Hoy refused the physician's recommendation and indicated that he would only accept the recommendation of Dr. Reese. Hoy also said that if Witherspoon were off

more than three days, he would be fired.  Witherspoon returned to work on the third day, but ended up in the emergency room because of pain.  Dr. Reese then referred Witherspoon to a specialist.  The specialist recommended three weeks of therapy, which Nash-Finch provided.

Witherspoon returned in April and was placed in Nash-Finch's Temporary Alternative Duty  ("TAD") Program.  TAD allows employees to do temporary work while recuperating from work-related injuries.  While on TAD, Witherspoon testified that, among other tasks, Nash-Finch assigned him to chop ice, a task that violated his medical restrictions.  Nash-Finch denies that Witherspoon chopped ice during this period of TAD.

In late April, Witherspoon filed a worker's compensation claim relating to his back injury.  In May 1993, Witherspoon reinjured his back.  Also in May, Witherspoon filed a discrimination complaint with the Kansas Human Rights Commission.  In that complaint, he asserted that Nash-Finch refused to accommodate his injury, work restrictions, and rehabilitation because of race- and disability-based discrimination.  His assertions of race discrimination were primarily based on the conduct of Hoy.  Hoy worked at the warehouse until mid-1993.  The record reveals that Hoy, while serving as warehouse superintendent, made racially discriminatory comments on several occasions, some of which were reported to Witherspoon.  After Hoy's transfer, there is no evidence of

discriminatory comments having been made by other Nash-Finch management personnel at the Liberal warehouse. Witherspoon did not work from August through December 1993 while he pursued additional therapy.

In January 1994, Witherspoon returned to work with temporary medical restrictions and was again placed in the TAD program. Among other tasks, Nash-Finch assigned Witherspoon to chop ice in the freezer, again in violation of his medical restrictions. Nash-Finch has also assigned injured white workers with similar medical restrictions to chop ice. Around this time, Carter, who had replaced Hoy as warehouse superintendent, made a comment that Witherspoon was lazy and faking his injury for insurance purposes. During February and March 1994, Witherspoon was assigned to tasks within his medical restrictions.

Witherspoon was released from his medical restrictions in April 1994. He returned to the selector position. His back injury worsened. In April and May 1994, he received both a verbal and a written warning for low productivity. Witherspoon, believing the Gagnon computer system to be rigged against him, informed the superintendent that he could not perform at the ninety percent productivity level. Between May and September 1994, Witherspoon was suspended on three occasions, ostensibly for his failure to meet the productivity threshold.

During Witherspoon's continuing worker's compensation case, the

administrative law judge overseeing the case ordered Witherspoon to be examined by Dr. Pedro Murati, an independent physician. In late September, Dr. Murati issued permanent restrictions on how much weight Witherspoon could lift and carry. Witherspoon did not work from mid-September 1994 through mid-January 1995. During this period, Nash-Finch's attorney told Witherspoon that he would not be subject to the ninety percent productivity requirement when he returned to work.

In early January 1995, Carter told Witherspoon that Nash-Finch would set up a position to accommodate Witherspoon's new medical restrictions. Later, though, Carter informed Witherspoon that he would be subject to the ninety percent productivity requirement and that Nash-Finch would not otherwise accommodate his condition. On January 15, 1995, Witherspoon returned to work in a freezer selector position. His back finally gave out. On January 25, Witherspoon told Carter that he could not continue working in the freezer and asked to be reassigned. The next day, in response to Witherspoon's request to work in a loader position, Carter told him to report to work at 3:00 p.m. When Witherspoon arrived, Carter terminated his employment. Carter explained to Witherspoon that he was being terminated because he was physically unable to perform the jobs available to him under the seniority system. Nash-Finch has also fired white selectors who were physically unable to perform their jobs. On

January 12, 1996, Nash-Finch again offered Witherspoon a freezer selector position. Witherspoon rejected this offer.

## Discussion

### I.    Standard of Review

We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed. R. Civ. P. 56(c). See Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995) (further citations omitted). Summary judgment is appropriate if no genuine issues of material fact exist -- that is, if no reasonable juror could return a verdict in favor of the nonmoving party. See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993).

### II.    Discriminatory Termination of Employment Claim

The district court dismissed Witherspoon's discriminatory discharge claims because he could not produce direct evidence of discrimination, nor could he satisfy the elements of a prima facie case of race-based termination. The district court found that the only direct evidence of race-based discrimination by Nash-Finch management were comments made by Rick Hoy, the warehouse superintendent until June 1993. Nash-Finch transferred Hoy to another city at that time, more than 18 months prior to Witherspoon's termination. During the year and a half following Hoy's transfer, plaintiff presented no direct evidence of

discrimination by Nash-Finch management.  The connection that plaintiff attempts to draw between Hoy's conduct and plaintiff's termination is not supported by the record.  Accordingly, we agree with the district court that the plaintiff has produced no direct evidence of discriminatory discharge.

We also agree that Witherspoon has failed to establish a prima facie case of discrimination.  In order to establish a prima facie case of discriminatory discharge in violation of Title VII or 42 U.S.C. § 1981, a plaintiff must show that (1) he belongs to a protected class, (2) he was qualified for the position, (3) that despite his qualifications, he was discharged, and (4) that after his discharge the job remained available.  See Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174-75 (10th Cir. 1996).  The district court found that Witherspoon could not show the second element of the prima facie test, i.e., that he was qualified for a position at Nash-Finch at the time of his termination.  The court based its conclusion on the following exchange that occurred during the defendant's deposition of Witherspoon:

> Q:	Other than the fork job you said you wanted, was there any other job given your medical restrictions you could have done that was available at the Nash-Finch warehouse in January, 1995?
> A:	None that my seniority would let me have.

Witherspoon v. Nash-Finch Co., No. 95-1128-MLB, slip op. at 31 (D. Kan. filed Mar. 3, 1997).  The court also cited to Witherspoon's explanation of the reasons he refused a Nash-Finch offer of reemployment as a freezer selector in January

-8-

1996:

> Q: Have you told me the reasons you didn't accept the position?
> A: Well, I didn't — I failed to mention that my work — because of my physical.
> Q: Because of your physical?
> A: My physical, I couldn't do the job because of my physical condition.
> Q: So the job — you felt like you could not perform physically the position that was offered to you in the January 12th, 1996 letter?
> A: Yes.

Id. at 32. Witherspoon raises several arguments why the above-quoted testimony is not decisive on his discharge claims.

First, he argues that his testimony actually reflects his belief that he was physically able to perform selector positions, but could not meet the company's productivity system because it was "slanted against blacks." Appellant's Br. at 16. We are unable to draw any such inference from the testimony quoted above or from the record as a whole. The plaintiff plainly admitted that he was no longer physically qualified to perform any available positions.

Even if this court were to accept the plaintiff's characterization of his testimony, he would nonetheless fail to make his prima facie showing. An employer is entitled to determine when an employee's failure to meet certain objective criteria renders him or her unqualified for employment, provided that such criteria are related to job performance, see Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971), and applied evenhandedly to members of all races, see McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 (1973). Thus,

Witherspoon's admission that he could not meet the productivity requirements at Nash-Finch may be regarded as an admission that he was unqualified for employment, absent evidence that the productivity system was indeed "slanted against blacks." Nash-Finch's productivity system is a direct measure of job performance and the record, as a whole, does not support the plaintiff's assertion that Nash-Finch's productivity system was applied differently based on an employee's race. Therefore, plaintiff has failed to prove that he was qualified for a position at Nash-Finch at the time he was terminated.

Second, plaintiff cites authority which purportedly supports the assertion that Witherspoon can make a prima facie case of race-based termination even if he is unable to show that he was qualified for a position at Nash-Finch at the time of his termination. We agree with the district court that the cases cited by plaintiff are inapposite.

Lastly, plaintiff asserts that the district court's finding allows Nash-Finch to "circumvent race discrimination and retaliatory discharge law by causing injury to an employee in the course of its discriminatory and retaliatory acts and be exculpated from responsibility by claiming the employee is no longer physically qualified for the position." Appellant's Br. at 16. We need not address this contention because we agree with the district court that there is "no evidence or reasonable inference which supports Witherspoon's assertion that Nash-Finch

-10-

harassed him with the intent to cause a disabling injury that would, in turn, force him to quit." Witherspoon, slip op. at 36. Thus, we affirm the district court's grant of defendant's summary judgment motion on Witherspoon's discriminatory discharge claims.

## III. Discriminatory Harassment Claim

The district court concluded that no reasonable jury could find the existence of a hostile work environment because the plaintiff "was simply not subjected to a barrage of opprobrious racial invective, and no one instance of harassment was sufficiently severe, in and of itself, to create an abusive working environment." Id. at 40. The district court thoroughly reviewed the record in reaching this conclusion, and plaintiff points to no error in the district court's review of the facts in the record. We affirm for substantially the reasons stated by the district court.

## IV. Retaliation for Filing a Worker's Compensation Claim

Under Kansas law, "an employee who cannot return to his or her former position does not have a retaliatory discharge claim." Griffin v. Dodge City Coop. Exch., 927 P.2d 958, 964 (Kan. Ct. App. 1996). The district court held that Nash-Finch was entitled to summary judgment on Witherspoon's retaliatory discharge claim because Witherspoon was not physically able to perform any available positions at Nash-Finch. Based on Witherspoon's admission in his

deposition that he could not perform any available jobs, there is no genuine dispute on this matter. Accordingly, we affirm the district court's grant of summary judgment on this claim.

## V. Jury Instruction Error

On plaintiff's claim that went to trial, he argues that the district court committed reversible error by issuing a jury instruction that unfairly prejudiced his case. "We review jury instructions de novo, and must view the instructions in their entirety, deciding not whether the instruction was completely faultless, but whether the jury was misled in any way." Coleman v. B-G Maintenance Management of Colo., 108 F.3d 1199, 1202 (10ᵗʰ Cir. 1997) (citing Gardetto v. Mason, 100 F.3d 803, 816 (10ᵗʰ Cir. 1996)). An error in jury instructions will warrant reversal "'if the jury might have based its verdict on the erroneously given instruction.'" Id. (quoting City of Wichita v. United States Gypsum Co., 71 F.3d 1491, 1495 (10ᵗʰ Cir. 1996)).

The challenged instruction stated: "The decision to terminate plaintiff's employment for reason of his physical inability to perform work at Nash-Finch was a mutual decision of plaintiff and Nash-Finch and therefore was not unlawful." Jury Instruction No. 17. Witherspoon contends that Nash-Finch did not accommodate his injury due to his race and that this race-based failure to accommodate led to his inability to perform his job, and hence, his termination.

-12-

Witherspoon argues the phrases "mutual decision" and "not unlawful" unfairly prejudiced him by suggesting to the jury that Nash-Finch's actions leading up to the termination, including its alleged failure to accommodate his injury, were not unlawful, even though the termination itself, based on plaintiff's inability to perform, was lawful. Thus, Witherspoon argues, "Instruction No. 17 had the effect of sanitizing all of Nash-Finch's actions in contributing to his workplace injuries." Appellant's Br. at 29. We disagree.

The district court expressed its concern about the instruction at the jury instruction conference. The court stated, "I just want [the jury] to focus on the issues before them and not get down a rabbit trail on what they may think the evidence shows on something else. They may think . . . that [Nash-Finch] unlawfully terminated him. And I don't want them deciding the case on that basis." Tr. at 1287-88. The court chose the language "not unlawful" to narrow the issues presented to the jury. The district court did not unfairly handicap Witherspoon in proving that Nash-Finch's actions *leading* to his termination were discriminatory, and therefore unlawful. Any concerns that Witherspoon had regarding the impact of Instruction 17 were more than satisfactorily addressed by Jury Instruction 12. Jury Instruction 12 stated:

> It is unlawful for an employer to intentionally discriminate against an employee with respect to seniority, conditions, terms, benefits or privileges of employment because of the employee's race. The plaintiff in this case, Benard Witherspoon, claims that the

-13-

defendant, Nash-Finch Company, intentionally discriminated against him because of his race by treating him in a manner which was different from similarly-situated white employees and by failing to accommodate his working conditions after learning of his February 1993 injury.

Furthermore, Jury Instruction 14 detailed what the evidence must show before a jury can find that the defendant engaged in discriminatory actions. Jury Instruction 16 explicitly stated that it was the jury's duty to determine whether there were any racially discriminatory factors in Nash-Finch's decisions regarding Witherspoon:

> In deciding whether or not the plaintiff has shown that his race was a motivating factor in the differential treatment claimed by him, you may not question or overrule the business judgment of the defendant. . . . [T]he defendant is still entitled to exercise its business judgment in the way it treated the plaintiff, so long as the plaintiff's race did not make the difference in those decisions. The determining factor is the presence or absence of racial motivation in the decisions made by the defendant with respect to the plaintiff.

These instructions immediately precede the jury instruction contested by Witherspoon. The instructions clearly informed the jury that Witherspoon was entitled to a verdict in his favor if Nash-Finch's employment actions were tainted by race-based discrimination, even though Witherspoon's termination occurred for other reasons.

We are not persuaded that the district court's instructions either misled or confused the jury. A review of the jury instructions in their entirety reveals that the jury had a panoply of law regarding when discrimination in employment exists

-14-

and when it does not.  The court's language of "not unlawful" and "mutual decision" did not unfairly prejudice the jury in considering Witherspoon's discrimination claim.  Therefore, reversal is not warranted.

## Conclusion

Based upon the foregoing conclusions, we cannot find error in the district court's grants of summary judgment or in its issuance of Jury Instruction No. 17.

AFFIRMED.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Circuit Judge