(172 P.3d 71)
No. 98,159

Rafaela Zepeda Deguillen, *Appellee*, v. Schwan's Food Manufacturing, Inc., and Hartford Accident & Indemnity Co., *Appellants*.

Opinion filed December 7, 2007.

*Mickey W. Mosier* and *Paula J. Wright,* of Clark, Mize & Linville, Chartered, of Salina, for appellants.

*D. Shane Bangerter,* of Rebein Bangerter PA, of Dodge City, for appellee.

Before RULON, C.J., GREENE, J., and BRAZIL, S.J.

GREENE, J.: Schwan's Food Manufacturing, Inc., and its insurer, Hartford Accident & Indemnity Co., (collectively Schwan's) appeal the decision of the Kansas Workers Compensation Board (Board) in its work disability award to employee Rafaela Zepeda Deguillen, arguing (i) the employee's failure to make a good faith effort to retain her employment should bar a work disability award; (ii) the award was calculated in a manner contrary to the applicable statute; and (iii) the order to pay unauthorized medical expenses was contrary to the applicable statute. We affirm Deguillen's eligibility for

and the Board's calculation of a work disability award, but we reverse the Board's award of unauthorized medical expenses.

## Factual and Procedural Background

Deguillen was injured in October 2003, complaining of pain reaching into her upper arm, shoulder, and neck. She was put on light duty until she was placed in an accommodated position in May 2005. Schwan's argues that she was uncooperative following her injury and throughout attempts to accommodate her employment. On June 6, 2005, Deguillen was terminated by a letter from her supervisor stating:

"It is with deep regret that I must inform you that Schwan's has decided to terminate your employment. Our decision is based on the fact that we are unable to reasonably accommodate your work restrictions. Your termination will be effective June 6, 2005. All pay, benefits and other entitlement from your employment will be computed on that basis."

In November 2005, an independent medical examination ordered by the administrative law judge (ALJ) resulted in an opinion of 15% permanent partial impairment of function of the body as a whole and in the following work restrictions:

"It will be necessary for her to permanently avoid work that involves movement of the left hand above shoulder level or for frequent reach away from the body more than 15 inches. No lifting should be done at areas more than 15 inches away from the body. Lifting with the left hand between waist and chest level should be limited to 10 pounds occasionally, 5 pounds frequently. She should avoid frequent grasp activity such as is necessary with operation of pliers, scissors and similar hand tools. She should avoid vibrating hand tools. She should avoid frequent flexion and extension of the left wrist greater than 30 degrees."

The ALJ concluded "that no amount of accommodation would have returned Claimant to work." The ALJ denied permanent partial work disability benefits because Deguillen "failed to exercise a good faith effort to return to work or to find alternative replacement employment." The ALJ noted the company used a "form letter" to terminate Deguillen but Schwan's "indeed could have, and would have, accommodated Claimant had she continued to work." The ALJ also denied reimbursement of claimant's expenses

for Dr. Murati's unauthorized medical expenses. The ALJ concluded Deguillen had a 14% whole body functional impairment, and awarded her 58.10 weeks of permanent partial disability for a total of $17,155.19 for a 14% functional disability, but denied her a work disability award.

Deguillen timely applied for review by the Board. The Board affirmed in part, reversed in part, and modified the ALJ's award in the following manner:

"58.10 weeks of permanent partial disability compensation at a rate of $295.27 per week or $17,155.19 for a 14 percent functional disability *followed by 253.15 weeks of permanent partial disability compensation at the rate of $297.53 per week or $75,319.72 for a 75 percent work disability, making a total award of $92,474.91.*

*"As of February 6, 2007 there would be due and owing to the claimant 58.10 weeks of permanent partial disability compensation at the rate of $295.27 per week in the sum of $17,155.19 plus 87.28 weeks of permanent partial disability compensation at the rate of $297.53 per week in the sum of $25,968.42 for a total due and owing of $43,123.61, which is ordered paid in one lump sum less amounts previously paid. Thereafter, the remaining balance in the amount of $49,351.30 shall be paid at the rate of $297.53 per week for 165.87 weeks or until further order of the Director.*

*"The claimant is also entitled to $500 in unauthorized medical."* (Emphasis added.)

In large part, the Board based its findings and conclusions on: (1) The termination letter stating Deguillen was fired because Schwan's could not accommodate her restrictions without any mention of her "lack of effort"; (2) there was no evidence presented "that the break crew job represented a job at comparable wages . . . [t]hus, it would be difficult to conclude that claimant abandoned a position that paid at least 90 percent of her preinjury average weekly wage"; and (3) Dr. Mills' recommendations for claimant, which did not include one of the tasks that was part of the so-called accommodated break crew job. Schwan's has timely appealed.

### Standard of Review

An appellate court's scope of review on a question of fact arising from an administrative proceeding is defined by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions. K.S.A.

77-621(c)(7) provides that the court shall grant relief only if an agency action is based on a determination of fact, made or implied, that is not supported by evidence that is substantial when viewed in light of the record as a whole. Substantial evidence in the workers compensation context is evidence possessing something of substance and relevant consequence to induce the conviction that an award is proper; it furnishes a basis of fact from which an issue can be resolved reasonably. The court reviews the evidence in the light most favorable to the prevailing party and does not reweigh competing evidence or assess the credibility of witnesses. *Graham v. Dokter Trucking Group*, 284 Kan. 547, Syl. ¶ 1, 161 P.3d 695 (2007).

### *Is the Board's Work Disability Award Supported by Evidence that is Substantial When Viewed in Light of the Record as a Whole?*

Schwan's argues that despite its letter of termination indicating inability to accommodate Deguillen's restrictions, she should be barred from a work disability award by reason of her failure to exhibit good faith to retain her employment, citing K.S.A. 44-510e(a) and, among other published authorities from our court, *Mahan v. Clarkson Constr. Co.*, 36 Kan. App. 2d 317, Syl. ¶ 2, 138 P.3d 790, *rev denied* 282 Kan. 790 (2006).

The good faith rule had its genesis in *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995), where this court construed K.S.A. 44-510e(a) to required a good faith effort by an employee to retain or find employment within his or her work restrictions after an injury. The purpose of the good faith rule is to prevent employees from taking advantage of the workers compensation system. *Cavender v. PIP Printing, Inc.*, 31 Kan. App. 2d 127, 132, 61 P.3d 101 (2003).

The record indeed contains evidence that Deguillen was less than cooperative in retaining her employment after the injury. As summarized by Schwan's,

"[s]he repeatedly demonstrated an unwillingness to cooperate with coworkers and supervisors after her injury in October 2003. On several occasions, while assigned to the return to work pool, employees found her sitting in the break room drinking

coffee after her shift began. When asked to return to work, she was uncooperative. Claimant was caught leaving work at the beginning of her shift without approval. When her supervisor met with her to discuss a tardiness issue, she became confrontational and told him he 'was full of it' resulting in a written warning for misconduct. Claimant also failed to report to the first aid station as required by company policy. When confronted, she lied and claimed the nursing staff excused her absence. Claimant did not put forth a good faith effort to maintain her employment, a fact which was clearly demonstrated by her repeated disciplinary problems while on light duty."

The Board acknowledged the good faith rule of *Foulk* but rejected Schwan's argument here, finding that "she was reporting to work and at no time did [Schwan's] commence progressive discipline against her" and concluding there were three "flaws" in Schwan's argument:

"First, there is no evidence that the break crew job represented a job at comparable wages. All the record shows is that the job was for 5-½ hours per day, nothing more. Thus, it would be difficult to conclude that claimant abandoned a position that paid at least 90 percent of her preinjury average weekly wage. . . .

"Second, while Dr. Mills concluded claimant was capable of performing the accommodated break crew job if the fill position was omitted from her rotation (as that job exceeded her reaching restrictions), [Schwan's] own representatives testified that this break crew job contemplated someone who was able to do all 4 of the job rotations and not just 3. And while they could accommodate those restrictions for a period of weeks, they could not do so for much more than a month. Thus, claimant's accommodation was not permanent or longstanding.

"Third, [Schwan's] terminated claimant from the break crew position. Although [Schwan's] argues that it terminated claimant because she essentially wasn't putting forth an earnest effort at the job, the termination letter to claimant by [Schwan's] clearly indicates it can no longer accommodate her restrictions. The letter says nothing about her lack of effort. [Schwan's] own writing clearly indicates it is no longer able to accommodate claimant's restrictions."

Regardless of whether the position from which Deguillen was terminated was a permanent job within her restrictions and at a comparable wage, the principal issue in this appeal is whether she was terminated because Schwan's refused to accommodate her restrictions or because she exhibited no good faith to retain that job. On this issue, we agree with the Board in focusing on the letter of termination from Schwan's; there is no indication from that letter that Deguillen was terminated for cause or for her lack of good faith.

Schwan's argues on appeal that the letter was a "form" letter and was erroneous in stating the reason for termination, but we cannot disagree with the Board, which obviously weighted that evidence rather heavily on the principal issue. Our standard of review is to review the factual basis for the Board's order to determine if it is "supported by evidence that is substantial when viewed in light of the record as a whole," K.S.A. 77-621(c)(7), but that standard does not allow us to reweigh the evidence. A letter of termination to an employee stating the basis of termination is substantial evidence of the reason for termination and may be overcome only in the rarest of cases. Here, as the Board noted, there was evidence that Deguillen consistently reported to work after her injury and there was only one documented instance of a discipline problem that could be construed as bad faith. If an employer intends to argue that a work disability award is barred by the bad faith of the employee, any documentation of termination should be consistent with, not contrary to, the employee's lack of good faith as a basis for termination.

We conclude the Board's determination that Deguillen was entitled to a work disability award is adequately supported by the record and must be affirmed.

### Did the Board Err in Calculating the Award?

Schwan's next argues the Board erred in calculating the award insofar as it exceeded the allowable limit imposed by K.S.A. 44-510e. The argument is articulated by Schwan's as follows:

"[T]he Board utilized an unreasonable calculation method that nullifies the effect of Claimant having worked for 86.43 weeks at comparable wagesa period during which, according to statute, she is not entitled to receive a PPGD [permanent partial general disability] rating in excess of her 14% functional impairmentand reached a decision contrary to statute.

. . . .

". . . The effect of the statute's proscription that the permanent partial general disability percentage for any weeks working at comparable wages (here, 86.43 weeks) cannot be higher than the Claimant's functional impairment rating has been eviscerated by the Board's calculation. Claimant received the same number of award weeks as if she had suffered a 75% work disability beginning the first day after her injury."

K.S.A. 44-510e(a)(1) contemplates an award that is a multiple of three factors: (wage rate at ⅔ preinjury gross wage) times (eligible weeks at 415 *less* all but 15 of the weeks where temporary total disability was paid) times (% permanent partial general disability rating [PPGD]). The issue framed by Schwan's is how to address the period of accommodation at comparable wages; should this period be deducted from the eligible weeks factor? Our answer is no; the statute does not contemplate *further* adjustment of this factor in the event of some accommodated weeks following injury.

The statutory proscription referenced in Schwan's argument is stated at K.S.A. 44-510e(a):

"An employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee is engaging in any work for wages equal to 90% of more of the average gross weekly wage that the employee was earning at the time of the injury."

Schwan's argues that to honor this statutory proscription, the PPGD percentage should be applied to 86.43/415 weeks and for the remaining 328.57/415 of the time period, the wage loss of 75% should be applied to yield a blended PPGD percentage of 62.3% for 415 weeks. Because we do not understand the statute to require such an adjustment or "credit" for accommodated weeks, we disagree with Schwan's and note that we have previously endorsed a calculation like the one here in *Bohanon v. U.S.D. No. 260*, 24 Kan. App. 2d 362, 369-70, 947 P.2d 440 (1997).

Although Schwan's argues that the Board's approach discourages an employer to attempt accommodated employment for an injured worker with restrictions, we disagree. Schwan's approach would encourage accommodated employment to be terminated after 415 weeks (having reached the maximum "credit") and leave the worker without any eligibility for work disability, rather than encourage accommodated employment to rehabilitate the worker and accommodate the worker's disabilities and return to gainful employment. See *Hughes v. Inland Container Corp.*, 247 Kan. 407, 416, 799 P.2d 1011 (1990). So long as the worker is provided an accommodated position with a comparable wage, the employer benefits by the potential reduction in benefits by reason of no work

disability. See *Griffin v. Dodge City Cooperative Exchange*, 23 Kan. App. 2d 139, 147-48, 927 P.2d 958 (1996), *rev. denied* 261 Kan. 1084 (1997). In other words, the encouragement should be for long-term sustained rehabilitative accommodation rather than a short-term "credit" to the total benefits payable by the employer.

Here, the Board honored the statutory formula and the allowable maximum in its award to Deguillen, and we conclude the calculation should be affirmed.

### *Did the Board Violate K.S.A. 2006 Supp. 44-510h(b)(2) in Ordering Reimbursement of Unauthorized Medical Expenses?*

Finally, Schwan's argues that the Board's order of reimbursement of Deguillen's unauthorized medical expenses up to $500 violated K.S.A. 2006 Supp. 44-510h(b)(2), which provides:

"Without application or approval, an employee may consult a health care provider of the employee's choice for the purpose of examination, diagnosis or treatment, but the employer shall only be liable for the fees and charges of such health care provider up to a total amount of $500. The amount allowed for such examination, diagnosis or treatment shall not be used to obtain a functional impairment rating. Any medical opinion obtained in violation of this prohibition shall not be admissible in any claim proceedings under the workers compensation act."

Here, Deguillen consulted Dr. Pedro Murati initially for an examination, but he subsequently asked Dr. Murati for an impairment rating letter based upon the prior examination. Schwan's argues this was an attempt to circumvent the statute by artificially separating the exam from the requested and prohibited impairment rating, thus gaining the advantage of the $500 allowance for an improper purpose. We agree.

K.S.A. 2006 Supp. 44-510h(b)(2) is clear: When an employee consults his or her own health care provider, the expense of an examination, diagnosis, or treatment is eligible for reimbursement up to $500, but "[t]he amount allowed . . . shall not be used to obtain a functional impairment rating." It is obvious to this court that an employee's physician cannot provide an impairment rating without an examination; if an impairment rating is sought based upon a prior examination for which the employee seeks reimburse-

ment, the unauthorized medical allotment has been used for an improper purpose, in contravention of the statute.

Here, the Board admitted that "it might appear that the claimant is doing indirectly what is directly prohibited by statute, namely obtaining a rating report at respondent's expense," but it approved the reimbursement relying on *Castro v. IBP, Inc.*, 29 Kan. App. 2d 475, 30 P.3d 1033 (2001). We distinguish *Castro*, however, because there the opinion on functional impairment was never made part of the record. Here, the Murati impairment rating was made a deposition exhibit, discussed in the deposition, and was considered and referenced by the Board in its discussion of functional impairment.

We hold that in order for an unauthorized medical examination to be eligible for reimbursement under K.S.A. 2006 Supp. 44-510h(b)(2), no impairment rating based upon that examination may be made a part of the record, upon penalty that the examination expense may not be reimbursed. In order for an unauthorized medical examination to be eligible for reimbursement under K.S.A. 2006 Supp. 44-510h(b)(2), no impairment rating may be solicited from that physician either as a part of the initial engagement or thereafter. Although employees are not prohibited from seeking independent advice on work-related injuries and may seek reimbursement for up to $500, the clear intent of the legislature is to prohibit such funds being applied to an improper impairment rating.

We conclude the Board erred in awarding $500 in unauthorized medical expenses under these circumstances and reverse this aspect of the Board's order.

In summary, we affirm Deguillen's eligibility for a work disability award together with the Board's calculation of that award. We reverse the Board's award of $500 in unauthorized medical expenses.

Affirmed in part and reversed in part.