(899 P.2d 516)
No. 71,838

ANTHONY K. LEE, *Claimant/Appellee/Cross-Appellant*, v. THE BOEING COMPANY—WICHITA, *Respondent/Appellant/Cross-Appellee*, and AETNA CASUALTY & SURETY COMPANY, *Insurance Carrier/Appellant/Cross-Appellee*, and WORKERS COMPENSATION FUND.

Opinion filed July 28, 1995.

*Frederick L. Haag* and *Stephen M. Kerwick*, of Foulston & Siefkin, of Wichita, for appellants.

*Michael L. Snider*, of Snider & Seiwert, L.L.C., of Wichita, for appellee.

Before BRAZIL, C.J., LARSON, J., and DANIEL L. LOVE, District Judge, assigned.

BRAZIL, C.J.: The Boeing Company—Wichita (Boeing) and Aetna Casualty & Surety Company appeal the Workers Compensation Board's (Board) determination that Anthony K. Lee had suffered a 37 percent work disability. Boeing argues that once the presumption of no work disability applies, it cannot be rebutted by evidence of a subsequent layoff. Lee cross-appeals, arguing that the evidence warrants a higher work disability rating. We affirm.

Lee worked for Boeing in the 747 wheel well department. His duties required him to work with 30-pound hand and pneumatic tools. In June 1991, he injured his back when he twisted while using a large hand tool called a squeeze.

Dr. Paul Lesko released Lee to return to work on October 14, 1991; however, Dr. Kenneth Zimmerman, at Boeing, continued to keep Lee off work until January 26, 1992, when he returned to work at the frame shop. Lee worked there for two weeks but could not complete the job because of excessive bending requirements. Lee was finally moved to a light duty job working with small hand tools and frames and remained there until he was laid off in June 1993 for economic reasons.

Before he was laid off, Lee's wages were comparable to his wages prior to his injury. After the layoff, Lee found employment as a karaoke host earning approximately $150 per week.

Two witnesses testified as to Lee's work disability. After considering the restrictions proposed to be placed on Lee by the Boeing doctor, Lee's evaluating physician, and Lee's treating physician, Jerry Hardin, a personnel consultant, testified that Lee had suffered a 53 percent wage loss.

Karen Terrill, a vocational rehabilitation counselor, considered the restrictions proposed by the Boeing doctor and Lee's evaluating physician. However, she concluded that since Lee returned to work for a year and a half at a comparable wage, he had suffered no wage earning loss.

The administrative law judge (ALJ) concluded that Lee had suffered a functional impairment of 7 to 8 percent and a 14 percent

work disability. The ALJ reached the work disability figure based on the average of a 28 percent labor market loss and no wage loss. Although it is not entirely clear in the opinion, the ALJ appears to have held that Lee rebutted the presumption of no work disability but provided no evidence of wage loss.

The Board rejected the ALJ's finding that Lee had presented no evidence of wage loss. The Board applied the presumption of no work disability. The Board held that the presumption was not overcome as to the period of time between the injury and the layoff. The Board held that the presumption was overcome as of the date of the layoff. The Board held that Lee had suffered a 37 percent work disability as of the date of the layoff. Boeing appeals. Lee cross-appeals.

Boeing's first two arguments amount to a contention that the Board erred in awarding a 37 percent work disability as of the date of the layoff. Boeing argues that once the presumption of no work disability applies, it may not be rebutted by evidence that Lee later lost his job due to an economic layoff. Boeing contends that the issue presented is one of statutory interpretation. Boeing points to K.S.A. 1992 Supp. 44-510e(a), which states in part:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced, taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general disability shall not be less than percentage of functional impairment. . . . There shall be a presumption that the employee has no work disability if the employee engages in any work for wages comparable to the average gross weekly wage that the employee was earning at the time of the injury."

Kansas appellate courts have discussed the presumption on a limited number of occasions. See *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 887 P.2d 140 (1994) (claimant cannot avoid presumption of no work disability by refusing an accommodated job at a comparable wage); *Elliff v. Derr Constr. Co.*, 19 Kan. App. 2d 509, 875 P.2d 983 (1993) (presumption applies where claimant returned to supervisory position with another employer for higher wage); *Locks v. Boeing Co.*, 19 Kan. App. 2d 17, 864 P.2d 738, *rev.*

*denied* 253 Kan. 859 (1993) (presumption overcome even though claimant returned to work for comparable wages); *Perez v. IBP, Inc.*, 16 Kan. App. 2d 277, 826 P.2d 520 (1991) (presumption of no work disability applies where claimant returned to work after injury and worked 33 of 57 days before he was fired for poor attendance).

Kansas courts have not addressed the issue of whether the presumption of no work disability may be applied as to one period of time and overcome as to another. This is a question of first impression requiring a close examination of the statute.

Statutory interpretation is a question of law over which this court has unlimited review. See *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992). The fundamental rule of statutory construction is that the intent of the legislature governs. *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993). In determining legislative intent, courts may consider the background of the enactment, the circumstances attending its passage, and the effect the statute may have under the suggested constructions. *West v. Collins*, 251 Kan. 657, Syl. ¶ 4, 840 P.2d 435 (1992).

There is little in the language of K.S.A. 1992 Supp. 44-510e(a) to indicate whether the presumption may apply to a certain time period and then be rebutted as to a subsequent time period. The presumption was added to the statute in 1987 as part of an ongoing attempt to fine-tune the permanent partial disability calculation. In *Hughes v. Inland Container Corp.*, 247 Kan. 407, 415-16, 799 P.2d 1011 (1990), our Supreme Court Stated:

"Prior to 1974, the theoretical basis for allowing compensation was 'the loss of earning power of the [worker].' [Citation omitted.] The standard that was employed to determine loss of earning capacity was the extent to which the worker's ability was impaired to procure employment in the open labor market and to perform and retain work of the same type and character that was performed before the injury. [Citations omitted.] The earning capacity test did not consider a worker's ability to perform work of a different type, and a claimant was not denied compensation even if he or she could obtain work on the open market of a different kind and nature. [Citation omitted.]

"In 1974, the Kansas Legislature abandoned the earning capacity test and adopted the physical impairment theory for determining permanent partial general disability by amending K.S.A. 44-510e. Under the 'physical impairment' test,

the test for determining permanent partial general disability was the extent to which the injured worker's ability was impaired to engage in work of the same type and character which was being performed at the time of the injury. [Citations omitted.] Under this theory, the court considers the percentage of the job requirements the claimant was performing at the time of the injury but could no longer perform. [Citation omitted.] Claimant's earning capacity or actual wage loss was not considered when determining permanent partial general disability. Under this test, it was possible for a worker to change job functions and earn the same wages but still receive a maximum award for disabilities because the claimant could not perform work of the same type and character that was being performed at the time of the injury. [Citation omitted.] This method did not provide incentive for the past employers to rehabilitate the worker or accommodate the worker's disabilities. Dissatisfaction with the physical impairment test led the legislature to amend K.S.A. 44-510, effective July 1, 1987."

The 1987 amendments were intended to modify the physical impairment theory, which allowed an award of 100 percent permanent partial general disability even though the worker could return to a job earning the same or better wages than before the injury. 247 Kan. at 416.

"In 1987, the law was changed so that the level of disability was based both on the employee's ability to perform work in the open labor market, and to earn comparable wages. However, the 1987 amendments established a presumption that the employee had no 'work' disability (that is, would not be compensated simply because he or she could no longer perform many jobs in the open labor market) if he or she worked for comparable wages after the injury. One purpose of that change was to prevent a claimant from changing job functions and earning the same (or higher) wages, but still receiving maximum award for disability." (Emphasis deleted.) Reviewing Selected Issues Related to Workers' Compensation, a Report to the Legislative Post Audit Committee by the Legislative Division of Post Audit, pp. 23-24 (February 1993).

The Legislative Division of Post Audit noted in 1993, however, that "[i]nterpretations of State law by Kansas courts have broadened the definition of work disability, and may have increased the total cost of claims, and therefore, premiums." Report at i. The report noted the *Hughes* decision, which held that both the ability to perform work in the open market and the ability to earn comparable wages should be considered in determining permanent partial disability. The report concluded that "[b]ecause of the *Hughes* decision, it may be easier for injured workers to qualify for

permanent disability benefits, even if they can earn wages comparable to their pre-injury wages." Report at 24. Further, "the law's ambiguities in the calculation of permanent partial disability benefits have resulted in higher litigation costs and inconsistent interpretations by the district courts." Report at 25.

The Special Committee on Workers Compensation, an interim committee of the Kansas Legislature, considered workers compensation reform prior to the 1993 session. Kansas Report on Legislative Interim Studies, Proposal No. 24, Workers Compensation, p. 183 (December 1992). The committee did not draft legislation but made several recommendations after extensive hearings. Interim Report at 190. The committee considered the problem of calculating permanent partial disability and encouraged the legislature to "continue working on statutory language to clarify worker disability." Interim Report at 191. The committee noted that "[t]he question that is central to the discussion of work disability is whether there is an irrebuttable presumption of no work disability as long as the employee is engaged in work of a similar nature and at a comparable wage to the work performed before the injury." Interim Report at 191.

Both the Division of Post Audit and the Special Committee addressed the problem of a worker receiving permanent partial disability benefits while at the same time earning a substantial post-injury wage. The Division of Post Audit recommended in its report that the legislature review the *Hughes* case and statutory language and make changes or clarifications necessary to reflect legislative intent. Report at 26.

With these recommendations in mind, the legislature amended the language of K.S.A. 1992 Supp. 44-510e(a) in 1993 to read:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury. . . . An employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee is engaging in any work

for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury." L. 1993, ch. 286, § 34.

After examining the legislative history of the permanent partial disability provision, it is clear that the presumption of no work disability was designed to help prevent a worker from "double dipping"—earning substantial post-injury wages while collecting work disability benefits. The 1993 legislature eliminated the presumption language altogether. The 1993 amendments simply prevent permanent partial disability compensation in excess of functional impairment *as long as* the employee earns 90 percent of his or her pre-injury wage.

If the 1993 amendments applied to Lee's injury, it is clear that Lee would not be entitled to work disability as long as he worked for Boeing. Under the plain language of the statute, however, if Lee stopped earning a comparable wage, he may have been entitled to work disability, subject to his ability to prove it.

This court is bound to apply the version of the presumption contained in K.S.A. 1992 Supp. 44-510e(a) since this version of the statute was in effect when Lee's cause of action arose. This version of the statute does not address whether the presumption of work disability can apply as to one period of time and be overcome as to another. The language of the 1993 amendments sheds some light on the issue.

"When the legislature revises an existing law, it is presumed that the legislature intended to change the law as it existed prior to the amendment." *Hughes*, 247 Kan. at 414. However, "this presumption may be strong or weak according to the circumstances, and may be wanting altogether in a particular case." *Board of Education of U.S.D. 512 v. Vic Regnier Builders, Inc.*, 231 Kan. 731, 736, 648 P.2d 1143 (1982).

The legislative history indicates that the 1993 amendments are merely the latest in a series of attempts by the legislature to ensure that a worker does not earn substantial post-injury wages while collecting work disability benefits. The 1993 amendments do not amount to a change in law surrounding the presumption but are merely a clarification. Thus, we choose to interpret the 1992 version of the presumption in light of the 1993 amendments.

Another way of discerning legislative intent is to consider the effect of the various constructions of the statute. Boeing urges us to construe the presumption of no work disability in such a way that if it applies at all, and is not overcome as to one period of time, it may not be overcome as to a later point in time based on an economic layoff. The effect of Boeing's construction is this: A large, well-paying employer could return an employee to a light duty job at his or her pre-injury wage. After a period of time, the employer could discharge the injured employee in the midst of downsizing. In this way, the employer would save money by paying the injured worker an inflated salary in an accommodated job for a period of time, then discharging the worker and avoiding work disability benefit payments based on the presumption.

Boeing claims that if its construction is not adopted, an injured employee fully able to perform work at a comparable wage would automatically receive work disability benefits if the employer went bankrupt and discharged its workers. This is simply not true. A claimant still has the burden to prove a work disability, whether or not the presumption of no work disability applies. Boeing also contends that a claimant could quit or "volunteer to be laid off" from a post-injury job in order to avoid the presumption. Our court has rejected this notion. See *Foulk v. Colonial Terrace*, 20 Kan. App. 2d at 283-84.

The Board's interpretation of the presumption is much more sensible and more closely aligned with the intent of the legislature. The Board denied Lee work disability in excess of functional disability while he worked for Boeing. Lee presented evidence of a substantial wage decrease after his layoff and expert testimony as to his loss of ability to earn a comparable wage. It is not the intent of the legislature to deprive an employee of work disability benefits after a high-paying employer discharges him or her as part of an economic layoff where the employer was accommodating the injured employee at a higher wage than the employee could earn elsewhere.

The Board did not err in awarding work disability.

Lee argues in his cross-appeal that the Board's award of 37 percent work disability is unsupported in the record. "In a workers

compensation case, the finder of fact's determinations should be affirmed if they are supported by substantial competent evidence." *Foulk v. Colonial Terrace*, 20 Kan. App. 2d at 285.

The Board concluded that Lee suffered a 29 percent reduction in access to the open labor market and a 45 percent loss in ability to earn a comparable wage. Using the *Hughes* averaging analysis, the Board found that Lee suffered a 37 percent work disability. Lee argues that the 45 percent figure is not supported by substantial competent evidence.

The Board arrived at the figure in the following manner:

"With regard to the claimant's ability to earn comparable wages, the Appeals Board finds that the claimant's pre-injury stipulated average weekly wage of $863.76 should be compared to a post-injury weekly wage of $475.00. The post-injury wage of $475.00 is arrived at by using Mr. Hardin's opinion of a post-injury wage of $350.00 per week averaged with a $600.00 post-injury wage. The $600.00 post-injury average weekly wage is found in the questionnaire that the claimant prepared for Mr. Hardin's evaluation. Claimant stated that he earned $15.00 per hour working forty plus hours per week as an auto mechanic from 1983 to 1988, prior to commencing working for respondent. Ms. Terrill concluded in her testimony that the claimant has the skill and physical ability to perform auto mechanic work. Utilizing these weekly wage figures, the claimant's ability to earn comparable wages has been reduced by forty-five percent (45%)."

Lee argues that Terrill testified that Lee could earn only $10 to $12 per hour as a noncertified auto mechanic. Lee indicated in a questionnaire, however, that he earned $15 per hour as a mechanic working for his father in Benton, near Wichita, for five years prior to going to work for Boeing. There is substantial competent evidence to support the Board's calculations.

Affirmed.