(41 P.3d 886)

No. 87,038

JOSE HERNANDEZ, *Appellant*, v. MONFORT, INC., *Appellee*.

Opinion filed March 1, 2002.

*Joseph Seiwert*, of Snider & Seiwert, L.L.C., of Wichita, for the appellant.

*Stephen Kerwick* and *D. Shane Bangerter*, of Foulston & Siefkin, L.L.P., of Dodge City, for the appellee.

Before PIERRON, P.J., JOHNSON, J., and BUCHELE, S.J.

PIERRON, J.: Jose Hernandez appeals the decision of the Workers Compensation Board (Board) that he did not qualify for a work disability.

At the time of the regular hearing in this case, Hernandez had been employed by Monfort, Inc. (Monfort) for 5½ years. In October 1996, as part of his job, Hernandez was on the kill floor pulling barrels weighing over 200 pounds and filled with hocks. He developed pain in his back that was unbearable. Hernandez went to his own physician, Dr. Oppliger, who diagnosed a lumbar strain. Restrictions were put on Hernandez' work until November 1996.

In July 1997, Hernandez began having more pain during his job. This time, the pain was isolated in his buttocks and legs. He was referred to Dr. Gilbert who ran an MRI, which indicated a herniated disc at the L-4-L-5 area of his back. Dr. Gilbert referred Hernandez to Dr. Abay who recommended surgery as a course of treatment. August was also the month Hernandez filed his application for a hearing with the Division of Workers Compensation.

Hernandez underwent surgery in February 1998 and was released to return to work in April 1998. Hernandez testified that when he returned to work, his work hours and, therefore, his pay had been reduced.

310

The Board found Hernandez had not proven a connection between his injury and the fact he now earns less than 90% of his pre-injury gross average weekly wage. The Board attributed this decrease in wage to be a result of Hernandez working less overtime hours. As a result, the Board held Hernandez was not entitled to a work disability.

The finding a claimant is not entitled to a work disability is a negative finding. Such findings are not to be disturbed "absent an arbitrary disregard of uncontroverted evidence or an extrinsic consideration such as bias, passion, or prejudice." *Parsons v. Seaboard Farms, Inc.*, 27 Kan. App. 2d 843, 848, 9 P.3d 591 (2000).

The crux of Hernandez' contention is that the Board erred in ruling he was not entitled to a work disability even though it found he was now making less. Monfort asserts there is no entitlement to a work disability simply because an employee earns less than 90% of his or her pre-injury wage when the reason for the decrease is not related to an injury. Here, Monfort maintained the reason Hernandez was making less was a decrease in work hours available due to the overall economic situation.

The Board stated:

"Intrinsic to the [Workers Compensation] Act is a requirement that there be some type of causal connection or nexus between the injury and the disability for which the benefits are being awarded. The injury must arise out of the employment. [Citation omitted.] In the case of work disability this requires, in our view, a nexus between the injury and both the task loss and the wage loss. K.S.A. 44-510e. . . . On its face, the language of the statute suggests the reason for the change in pay is irrelevant. Nevertheless, the Board believes the fundamental function and purpose of the Act requires that there be a nexus between the injury and the wage loss before that loss can be a factor used to calculate the amount of benefits."

Kansas case law offers several examples of workers compensation claimants who earned less than 90% of their pre-injury wage but did not receive work disability. For instance, in *Perez v. IBP, Inc.*, 16 Kan. App. 2d 277, 279, 826 P.2d 520 (1991), Perez was not awarded work disability because he returned to the same work for the same wage after his injury. And in *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 284, 887 P.2d 140 (1994), *rev denied* 257

Kan. 1091 (1995), this court rejected arguments by Foulk she should be awarded work disability even though she refused to accept a position she could handle at a wage similar to the one she earned before her accident.

The Board noted that Hernandez' case was unusual in that he returned to work with restrictions but continued to earn an hourly rate of pay that was never less than 90 percent of the pre-injury hourly rate. "This unique factual situation warrants a finding that [Hernandez] has not sustained a wage loss because the wage reduction is based upon economic factors affecting all of [Monfort's] employees and not just [Hernandez]."

Hernandez asserts four reasons why the Board's decision was incorrect. The first reason cited was that the Board's decision ignores the alleged plain language of K.S.A. 44-510e. Under K.S.A. 44-510e(a), a claimant

"shall not be entitled to receive permanent partial general disability compensation [work disability] in excess of the percentage of functional impairment as long as the employee is engaging in any work for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury."

K.S.A. 44-510e(a) is not a guarantee of work disability. The statute only says that a claimant cannot receive work disability in excess of the functional impairment rating if she or he is earning 90% or more of what was earned before the injury. The statute does not state the claimant shall be awarded work disability when making less than 90% of what was earned before the injury, only that he or she cannot be awarded work disability under a certain circumstance. Hernandez' argument fails.

The second reason asserted was that the Board's decision was inconsistent with Kansas case law. As discussed above, the Board's decision is in line with this court's decisions in *Perez* and *Foulk*. Hernandez cites *Lee v. Boeing Co.*, 21 Kan. App. 2d 365, 899 P.2d 516 (1995), as bolstering his claim. Lee worked for Boeing when he was injured. After the injury, Lee was laid off. However, at the time of the layoff, Lee's earnings were comparable to what they were before the injury.

Lee presented testimony his wage decreased after the layoff and that his ability to earn a comparable wage was lost. This is where Lee and Hernandez part paths. Hernandez' hourly rate of pay did not ultimately decrease after the injury and there was never evidence presented he could not earn a comparable wage to the wage he earned before the injury. *Lee* can be distinguished, and Hernandez' argument fails.

Next, Hernandez asserts the Board's decision was in error because it is inconsistent with the bright line 90% rule adopted by the legislature. This argument puts the proverbial cart before the horse. Hernandez assumes the 90% mark approved by the legislature is a bright line from which anything below must receive work disability. As discussed above, however, this is not a bright line rule under the Kansas courts' interpretation of the statute. There will be some instances when a less than 90% rating does not yield work disability. See *Perez* and *Foulk*.

Finally, Hernandez asserts the Board's decision was incorrect because it was inconsistent with other provisions of 44-501 *et seq.* Hernandez' argument here concerns pre-and post-injury wage calculation. This argument is unrelated to the question of Hernandez' work disability and Monfort's work decisions.

There is no evidence in the record on appeal that the Board had the required bias, passion, or prejudice that would be needed to disturb this negative finding. As discussed below, there was substantial competent evidence to support the Board's finding that Hernandez' wage loss was based on Monfort's business decision to eliminate overtime. As such, the Board had evidence to support its finding that Hernandez was not entitled to work disability. Hernandez' arguments to the contrary fail.

The next issue is whether there was substantial competent evidence to support the Board's finding that Hernandez' wage loss was based on Monfort's decision to eliminate overtime.

"As to questions of fact, the appellate court reviews the record only to determine whether it contains substantial evidence to support the trial court's finding, and in doing so all the evidence is reviewed in the light most favorable to the prevailing party below. Only in the event the evidence is undisputed is the question one of

law for appellate review. [Citation omitted.]" *Lawrence v. Cobler*, 22 Kan. App. 2d 291, 294-95, 915 P.2d 157, *rev. denied* 260 Kan. 994 (1996).

According to the Board,

"[Monfort] argues and the record supports the contention that the reduction of [Hernandez'] gross average weekly wage was due to the reduction in the amount of [Hernandez'] overtime. The human resources director testified that, for financial reasons, there were efforts to reduce the amount of overtime and almost all unscheduled overtime at the plant had been reduced. It is significant to note this reduction in overtime was plant wide and not just limited to [Hernandez]. Moreover, the human resources director's uncontradicted testimony was that because of changed job duties a [supervisor like Hernandez] no longer works more hours than the employees he supervises.

"Following his surgery, [Hernandez] returned to work on the slaughter side of [Monfort's] plant. When [Hernandez] returned to work his hourly rate of pay fluctuated but was never less than 90 percent of the pre-injury hourly rate of pay. With pay raises [Hernandez] was earning a higher hourly rate at the time of the regular hearing than his hourly rate at the time of the accident. The uncontroverted testimony was that [Hernandez] was physically able and did work any available overtime. The evidence establishes that the current reduction in [Hernandez'] gross average weekly wage is not related to his restrictions imposed because of his work-related accident but is instead related to his employer's economic business decisions."

Hernandez argues that the testimony of Monfort's own witness demonstrates there was not a plant-wide elimination of overtime. Monfort did not address this issue in its brief.

William LaMarr, Human Resource Director for Con-Agra, was deposed on this issue. In his position, he compiled records of personnel at the Garden City plant, including payroll and hours worked. LaMarr testified Hernandez began working for Monfort in March 1992 and continued to work there at the time of the deposition. Prior to LaMarr's arrival at the plant, overtime was not being managed correctly. Since LaMarr's arrival, there was a "[v]ery strong focus on the reduction of overtime, very strong." When asked if the plant had been able to reduce overtime, LaMarr responded, "We have just almost completely eliminated all unscheduled overtime in this plant." Unscheduled overtime, as opposed to scheduled overtime, occurs when a portion of the assembly line process breaks down and certain workers are needed to correct the problems. Although LaMarr testified he did not have

any knowledge about Hernandez being denied overtime since returning to work after his surgery, LaMarr did say Monfort did not have a policy of keeping injured workers from working overtime.

At the time of the accident in October 1996, Hernandez was earning $10.40 per hour as the lead person on the kill floor. And, for example, from the time of the accident in October 1996 to 1 year later, Hernandez worked over 110 hours of overtime. At the time of the regular hearing in December 1999, Hernandez was actually earning more per hour—$10.50—because of pay raises. For approximately 10 months before the regular hearing, Hernandez worked only about 8 hours of overtime. As a result, Hernandez' weekly wage did decrease.

However, Hernandez was unable to present any information to refute Monfort's assertion the decrease in his weekly wage was because of a plant-wide decrease in overtime. There was substantial competent evidence, especially with the testimony of LaMarr, that the decrease was because Monfort was trying to reduce overtime and not because Hernandez had been injured.

Finally, we must determine if the Board erred in computing Hernandez' weekly wage. Hernandez contends the Board erred in using a 48-hour work week as opposed to a 35-hour work week in computing his weekly wage. Monfort argues the Board had to use the 48 hours to compute the post-injury wage because it used 48 hours to compute the pre-injury wage.

This issue involves statutory interpretation, over which this court has unlimited review. While an appellate court gives deference to the Board's interpretation of the law, if such interpretation is interpreted or applied erroneously, the court may grant relief. *Burton v. Rockwell International*, 266 Kan. 1, 5, 967 P.2d 290 (1998).

K.S.A. 44-511(b)(4)(B) addresses the computation of a full-time hourly employee's average gross weekly wage. The statute states in relevant part:

"(i) A daily money rate shall first be found by multiplying the straight-time hourly rate applicable at the time of the accident, by the customary number of working hours constituting an ordinary day in the character of work involved; (ii) the straight-time weekly rate shall be found by multiplying the daily money rate by

the number of days and half days that the employee usually and regularly worked, or was expected to work, but 40 hours shall constitute the minimum hours for computing the wage of a full-time hourly employee, unless the employer's regular and customary workweek is less than 40 hours, in which case, the number of hours in such employer's regular and customary workweek shall govern; (iii) the average weekly overtime of the employee shall be the total amount earned by the employee in excess of the amount of straight-time money earned by the employee during the 26 calendar weeks immediately preceding the date of the accident, or during the actual number of such weeks the employee was employed if less than 26 weeks, divided by the number of such weeks; and (iv) the average gross weekly wage of a full-time hourly employee shall be the total of the straight-time weekly rate, the average weekly overtime and the weekly average of any additional compensation."

The Board determined Hernandez' gross average weekly pre-injury wage to be $579.26 and his gross average weekly post-injury wage to be $504. The pre-injury wage was assigned by multiplying Hernandez' hourly rate at the time of the accident ($10.40) by 48 weeks (8 hours a day, 6 days a week), arriving at a figure of $499.20. The Board then added up the overtime Hernandez worked during the 26 calendar weeks immediately before the accident. The answer of $2,081.67 was divided by 26, yielding $80.06. The $80.06 was then added to $499.20, giving a straight-time weekly wage plus overtime of $579.26.

The gross weekly post-injury wage was determined by multiplying $10.50 by 48, yielding $504.

Hernandez argues a 35-hour work week should have been used in computing his weekly wage instead of a 48-hour work week. At the regular hearing, Hernandez testified as follows:

"Q. And the workers you supervised were normally scheduled to work five days a week?
"A. Yes, six—five, sometimes six.
"Q. You yourself would normally be scheduled to work five days per week?
"A. Also.
"Q. And sometimes you would work six?
"A. Yes, sometimes."

### The Board found:

"The uncontradicted testimony in this case is that [Monfort's] employees are told when hired that they work Monday through Saturday and that they must keep Saturdays open and available for work. Further, it was [Hernandez'] uncontrad-

icted testimony that he did work on some Saturdays. [Monfort] did not proffer any exhibits detailing how frequently [Hernandez] was required to work a six-day week. It is therefore the Board's determination that [Hernandez] has met his burden of proof to establish that he worked a 6-day work week and his average weekly wage should be computed on the basis of a 48-hour work week."

Under K.S.A. 44-511(b)(4)(B), 40 hours is supposed to be the *minimum* hours for calculating the wage of a full-time hourly employee like Hernandez. The hours for the calculation can be less than 40 only if "the employer's regular and customary workweek is less than 40 hours." Since Hernandez is arguing for a 35-hour work week, he must demonstrate the employer's regular and customary work week is less than 40 hours.

LaMarr testified about Monfort's contract with the union, of which Hernandez was a member. The contract contained agreements about pay and the number of hours guaranteed to a full-time employee.

"A.    The standard [number of hours worked] is 34 hours a week. We are able to reduce that a certain number of times down to 32.

"Q.    But you—your normal work week is 40 hours; is that correct?

"A.    We—our goal is to work actually 48 hours a week, but we're not able to achieve that at this time."

LaMarr later stated any hours worked over 40 were counted as overtime.

It should be noted the contract between Monfort and the union mentions the 34 hours as a guarantee of *at least* what the employee will be working. The actual part of the contract dealing with hours of work lists the basic work week as 40 hours.

The Board erred in calculating Hernandez' pre-and post-injury wage with 48 hours. According to the Board, it based its decision that Hernandez worked a 48-hour week based on his own testimony. However, Hernandez testified he *normally* worked 5-day weeks and *sometimes* worked 6-day weeks. In addition, the contract between Monfort and the union indicates the basic work week is 40 hours, not 48.

The case must be remanded to the Board with instructions to calculate Hernandez' pre-and post-injury wage using a 40-hour work week instead of a 48-hour work week.

Affirmed in part, reversed in part, and remanded with directions.