(74 P.3d 42)

No. 89,681

CAROL SHARP, *Appellee*, v. CUSTOM CAMPERS, INC., Self-insured, *Appellant.*

Opinion filed May 16, 2003.

*John I. O'Connor* and *Troy A. Unruh*, of The Advocates Group, LLC, of Pittsburg, for appellant.

*William L. Phalen*, of Pittsburg, for appellee.

Before BEIER, P.J., JOHNSON, J., and WAHL, S.J.

JOHNSON, J.: Custom Campers, Inc., (Custom Campers) appeals the order of the Board of Workers Compensation (Board) granting work disability to Carol Sharp. Based upon the applicable statutory law and our standard of review, we affirm.

Custom Campers built campers. Sharp's job with Custom Campers involved the use of a buffer in fiberglass repair. On August 16, 1999, the buffer that she was using to scrub the fiberglass suddenly jerked Sharp's body, resulting in immediate pain in her neck and down her shoulder. Sharp continued to work while seeking medical treatment. Eventually, on January 5, 2000, Sharp had surgery, specifically described as an anterior cervical diskectomy and fusion with plate and screws.

Sharp returned to work on March 13, 2000, with restrictions that she perform no buffing and perform sanding only if tolerated. Upon her return, Sharp worked as a precleaner; her duty was to clean the inside of the trailers before they proceeded to quality control. She also worked in the false bottoms section where she installed the cabinet bottoms, which covered the wiring. She was able to perform these jobs and her pay was the same as before the injury.

In February 2001, Sharp, along with other employees, was laid off because of a business downturn. While she was receiving unemployment benefits, she submitted job applications to two to three places a week. Her unemployment benefits were terminated in August 2001, and she utilized financial aid and student loans to commence college courses, studying to be a computer service technician. While attending college classes, Sharp continued her job search, applying and checking one or two places a week. Sharp testified that if she was offered a job, she would take the job and try to keep going to college.

At the hearing before the administrative law judge (ALJ), Sharp stated that she continued to have headaches, muscle spasms, and neck pain, and that her grip was weaker than before the surgery. Dr. Edward Prostic, an orthopedic surgeon, testified as to Sharp's permanent partial impairment, her work restrictions, and her task

loss resulting from her work-related injury at Custom Campers. Dr. Dale Darnell, another orthopedic surgeon who performed an independent examination of Sharp, testified that Sharp had a 14% impairment to the body as a whole because of her cervical spine; her continued mild symptoms constituted an 8% impairment and the remaining 6% came from her measured loss of motion. He stated that Sharp would not have objective limitations from the medical perspective, but her subjective limitations might impose some restrictions.

The ALJ, quoting *Watkins v. Food Barn Stores, Inc.*, 23 Kan. App. 2d 837, 839, 936 P.2d 294 (1997), held Sharp was entitled to a 14% permanent partial general body disability but denied an award of work disability, stating that "[i]f following an injury an employee is physically able to return to work, perform his or her job duties without special accommodation, and earn a wage comparable to his or her preinjury wage, then by definition that employee does not have a work disability."

On appeal, the Board found that Sharp returned to an accommodated position after her injury and that she was earning less than 90% of her preinjury wage after she lost her job in the economic layoff. The Board further found that Sharp had made a good faith effort to find appropriate employment. The Board noted that *Watkins* did not apply because it involved a different definition of work disability. Therefore, the Board awarded Sharp a 41.5% permanent partial work disability as well as the 14% functional disability. Custom Campers appeals the work disability award.

Work disability is governed by K.S.A. 44-510e(a); the current version provides in part:

"The extent of permanent partial general disability [work disability] shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury. . . . An employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee is engaging

in any work for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury."

Issues involving interpretations of statutory provisions are questions of law over which appellate courts have unlimited review. While an appellate court gives deference to the Board's interpretation of the law, if such interpretation is applied erroneously, the court may grant relief. *Pruter v. Larned State Hospital*, 271 Kan. 865, 868, 26 P.3d 666 (2001). The Board reviews questions of law and fact, but we only review questions of law. The question of whether the Board's decision is supported by substantial competent evidence is a question of law, albeit on appeal we do not reweigh the evidence or assess witness credibility. See *Griffin v. Dale Willey Pontiac-Cadillac-GMC Truck, Inc.*, 268 Kan. 33, 35, 991 P.2d 406 (1999).

Custom Campers attacks the work disability award by alleging: (1) the granting of work disability was contrary to K.S.A. 44-510e and *Watkins* because Sharp did not return to an accommodated position and did not have work restrictions; (2) Sharp's leaving the job market to return to school full time required that her wage loss be determined based upon her capacity to earn wages; and (3) the amount of work disability should have been calculated based upon what Sharp could have been earning in a full-time job.

Underlying Custom Campers' various arguments is the allegation that Sharp did not return to work in an accommodated position following her injury and, therefore, her wage loss was caused solely by an economic layoff. Custom Campers relies on *Watkins*, which held:

"If following an injury an employee is physically able to return to work, perform his or her job duties without special accommodation, and earn a wage comparable to his or her preinjury wage, then by definition that employee does not have a work disability. See K.S.A. 1992 Supp. 44-510e(a). If the employee subsequently loses the job for economic or other reasons, the loss of employment cannot by itself create a work disability, absent a change in the employee's physical condition. In other words, the loss of a job does not change an employee's physical ability to perform work in the open labor market and earn a comparable wage. It is the employee's ability to perform work at a comparable wage which determines work disability, not whether the employee is utilizing that ability." 23 Kan. App. 2d at 839.

Custom Campers' reliance on *Watkins* ignores the statutory amendments which now place the focus on a claimant's actual wage loss in lieu of the claimant's ability to earn wages. Further, an employee in an accommodated position can be eligible for work disability, even if discharged as part of an economic layoff, if the employee cannot earn the same wage elsewhere. See *Lee v. Boeing Co.*, 21 Kan. App. 2d 365, 372, 899 P.2d 516 (1995).

Custom Campers insists that Sharp did not return to an accommodated position. "Accommodated work inevitably will differ in some respect from an employee's previous work." *Parsons v. Seaboard Farms, Inc.*, 27 Kan. App. 2d 843, 847, 9 P.3d 591 (2000). Sharp did not return to the fiberglass repair department because her postinjury work restrictions precluded her from using a buffer, which was an integral part of her former job. We decline Custom Campers' invitation to reweigh the evidence on Sharp's work restrictions; the evidence established that Sharp could no longer hold a buffer, weighing 8 to 10 pounds, above her head or straight out in front of her for 4 to 6 hours per day. Therefore, the evidence supported a finding that the new jobs, precleaning and installing false bottoms, were accommodated positions provided by Custom Campers. Accordingly, Sharp was eligible for work disability, notwithstanding her economic layoff.

Custom Campers next argues that Sharp voluntarily withdrew from the job market when she became a full-time college student and, therefore, the Board should have imputed a wage which Sharp could have been earning. In essence, Custom Campers challenges the Board's finding that Sharp was making a good faith effort to obtain employment. The employer points to Sharp's failure to provide a list of prospective employers with whom she filed job applications. Again, we decline to weigh the evidence. Sharp testified that she continued to seek employment after enrolling in college, and that she would have accepted a proffered full-time job. We must accept the Board's finding that Sharp was making a good faith effort to obtain employment.

Finally, Custom Campers takes issue with the Board's determination that Sharp suffered a 41% work disability rating. Basically, Custom Campers again challenges the Board's failure to impute a

posttermination wage based on what it believes Sharp could have been earning. The statutory calculation averages the task loss, which Custom Campers does not dispute, with the "difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury." K.S.A. 44-510e(a). We have given deference to the Board's finding of Sharp's good faith effort to obtain replacement employment and, accordingly, must reject Custom Campers' argument that Sharp chose to attend school and work part-time in lieu of obtaining full-time employment. Therefore, the Board did not err in using Sharp's actual posttermination wages in the work disability formula.

Affirmed.