(77 P.3d 494)

No. 89,966

Wesley Tallman, *Appellee*, v. Case Corporation, *Appellant*.

Opinion filed October 10, 2003.

*Stephen M. Kerwick* and *Vaughn Burkholder*, of Foulston Siefkin, LLP, of Wichita, for the appellant.

*William L. Phalen*, of Pittsburg, for the appellee.

Before Malone, P.J., Pierron, and Green, JJ.

Pierron, J.: Case Corporation (Case) appeals the decision of the Workers Compensation Board of Review (Board) awarding permanent partial general disability benefits to Wesley Tallman. Case argues the Board erred in refusing to apply *Watkins v. Food Barn Stores, Inc.*, 23 Kan. App. 2d 837, 936 P.2d 294 (1997), and that the Board's approach of allowing work disability based on the coincidence of an injury and an economic layoff is inconsistent with the goals of the Workers Compensation Act, K.S.A. 44-501 *et seq.* We affirm.

The basic facts are undisputed. In 1999, Tallman began working for Case as a welder building skid steer loaders. On July 18, 2000, Tallman was pulling a loader frame from one station to another when he felt a pop in his back. He finished his night shift and reported the injury to his supervisor the next day and then to the company physician, Dr. Wilson. Due to his previous back surgery, Dr. Wilson referred Tallman back to Dr. Paul Stein.

Dr. Stein first saw Tallman in 1995 for a lower back injury occurring at a different employer. Dr. Stein performed a left L5-S1 partial discectomy in 1996. Dr. Stein performed a functional capacities evaluation following the surgery, and he recommended that Tallman return to work without major work restrictions. Tallman testified he had back symptoms for approximately 6 months after the first surgery, but the symptoms dissipated. Dr. Stein gave Tallman a 7% functional impairment rating at that time.

On August 23, 2000, Dr. Stein determined Tallman injured the same disc area as he had earlier, but this time on the right side at the L5-S1 disc with impingement on the nerve root. After failure of conservative treatments, Dr. Stein performed another discectomy on the L5-S1 disc. Tallman was placed on light duty by Dr. Stein and returned to work at Case on November 26, 2000. On January 25, 2001, Dr. Stein released Tallman to return to full duty work with the same restrictions he had received following the first surgery, which were essentially none. Dr. Stein gave Tallman an additional 4% functional impairment rating. Tallman testified he returned to his regular welding duties approximately 2 weeks *before* being released by Dr. Stein.

Tallman testified his back continued to hurt despite the fact that the company-wide workload had decreased from 9 or 10 frames per shift to approximately 5 frames per shift. Tallman stated that he would not have been able to work at full capacity building 9 or 10 frames per shift and that his symptoms while building 5 frames were such that he was contemplating a revisit to Dr. Stein.

On February 8, 2001, the economic downturn caused Case to reduce its workforce. Tallman, along with 11 other welders, was laid off for economic reasons. The layoffs were based on seniority.

From the time of the layoff until the regular hearing on December 4, 2001, Tallman made modest efforts in finding a job, and he remained unemployed except for a brief period. Dr. Stein reevaluated Tallman and found that he had a 5%, rather than 4%, functional impairment rating following the July 2000 injury. Tallman obtained a second evaluation by Dr. Pedro Murati who opined that Tallman had an 11% functional impairment attributable to the 2000 injury and a 20% whole body functional impairment overall.

Dr. Murati also testified concerning Tallman's loss of ability to perform the work tasks he performed during the previous 15 years. Dr. Murati used the vocational rehabilitation report produced by Karen Crist Terrill and testified that Tallman lost the ability to perform 12 of the 19 tasks, or 63%, due to the July 2000 accident.

The administrative law judge (ALJ) found that Tallman returned to an unaccommodated position at Case for the same wage he was earning when he suffered the current injuries. The ALJ held Tallman's recovery was limited to functional impairment, and he averaged the rating from Dr. Stein and Dr. Murati to arrive at an 8% functional impairment. The ALJ stated Case terminated Tallman due to an economic slowdown, not because of the injuries, and therefore the rule in *Watkins*, 23 Kan. App. 2d 837, prevented Tallman from receiving permanent partial disability benefits.

The Board disagreed with the ALJ and awarded Tallman a 57% permanent partial general disability following his layoff based on the average between Tallman's 63% task loss and a 50% imputed wage loss due to Tallman's failure to exert a good faith effort to find appropriate employment. The Board distinguished *Watkins*, applied *Gadberry v. R.L. Polk & Co.*, 25 Kan. App. 2d 800, 975 P.2d 807 (1998), and found the logic of *Watkins* did not apply to the present version of K.S.A. 44-510e.

The first issue we must resolve concerns the Board's finding that Tallman returned to work at Case in an accommodated position.

The Board reviews questions of law and fact, but we only review questions of law. The question of whether the Board's decision is supported by substantial competent evidence is a question of law, albeit on appeal we do not reweigh the evidence or assess witness credibility. See *Griffin v. Dale Willey Pontiac-Cadillac-GMC Truck, Inc.*, 268 Kan. 33, 34, 991 P.2d 406 (1999).

Case argues there is no evidence that Tallman had an accommodated job due to any work restrictions imposed by Dr. Stein. Case states that Tallman was released to return to full work duty. Case argues "[t]he Board attempted to circumvent this uncontroverted fact [full work duty] by discussing lower work loads that also resulted from economic slowdown at the plant, but there is no

evidence or even a suggestion that a lower workload was specifically arranged as an accommodation to Mr. Tallman."

Tallman contends the Board correctly found that he was not placed in the same job following his injury because the work was "considerably less demanding and less strenuous" than before his injury. He contends his testimony and that of Richard Cisneroz support the Board's finding that production on the XT line was 50-58% decreased, that he would not have been able to perform the job at full production, and that Dr. Stein testified that he would need to perform a functional capacities evaluation on Tallman to determine the functional ability and work restrictions following the current injury. Tallman states there is no medical evidence he could do his preinjury unaccommodated job. He argues this court should find there is substantial competent evidence to support the awarding of permanent partial disability and the award should be upheld. He maintains this court would be required to pass on the credibility of the witnesses and reweigh the evidence in order to reverse the Board's decision.

In response to the Board's finding of accommodation, Case argues this is not the same thing as an employer reducing or lightening an employee's work load due to work restrictions as contemplated by Workers Compensation Act. Case states:

"No job is the same from day to day, no matter how uniform the employer's aspirations. Fluctuations in speed and volume will ordinarily occur. That a group of employees experiences a lighter load for a period of time does not mean that one member of that group has been 'accommodated' simply because he was recently returned after a workers compensation injury."

Placing an injured worker in an accommodated position temporarily masks the worker's work disability. When the accommodated worker leaves the confines of accommodated employment, the disability reemerges. The accommodated worker is less likely to be able to find comparable wage work because the ongoing physical limitation will make him or her less attractive to a new employer who will not have the economic incentive to accommodate in order to reduce compensation costs.

It is undisputed that Tallman ultimately returned to the same job at Case he performed prior to his injuries for the same pay.

However, it is also uncontradicted that the assembly line to which Tallman returned was producing considerably less frames per shift than it did before the injuries. "Accommodated work inevitably will differ in some respect from an employee's previous work." *Parsons v. Seaboard Farms, Inc.*, 27 Kan. App. 2d 843, 847, 9 P.3d 591 (2000). There is substantial competent evidence to support the Board's finding that Tallman returned to a situation identical to an accommodated position because the "job was considerably less demanding and less strenuous than the job that he was working before his accident."

The facts of this case are unusual because Tallman did not have the opportunity to perform his preinjury job, in its full intensity, before he was laid off due to an economic downturn. Case argues Tallman's return to a lighter duty job was an economic accommodation and not an accommodation due to Tallman's injuries. The problem we have here is no one knows whether Tallman could have performed his preinjury job at full capacity. We know production was down at Case. Cisneroz testified that Tallman was eager to get back working at his old job after his injury and that Tallman was not a complainer. Tallman also testified that his back continued to hurt after the injury despite the fact that the company-wide workload had decreased, he believed he would not have been able to work at full capacity building 9 or 10 frames per shift, and his symptoms while building 5 frames were such that he was contemplating a revisit to Dr. Stein. Had the shop been working at full capacity and Tallman had been given only 5 frames per shift, there would have been no doubt that the position would have been accommodated.

We find there is substantial competent evidence to support the Board's finding that Tallman returned to a situation identical to an accommodated position at Case, or at least was never given the opportunity to return to the capacity of his preinjury position.

Case also argues Tallman's situation is identical to *Watkins* and he should be denied work disability benefits. We disagree and find the *Watkins* rule does not apply, not because of the 1993 amendments to K.S.A. 44-510e, but because Tallman was returned to a situation identical to an accommodated position.

Work disability is governed by K.S.A. 44-510e(a); the current version provides in part:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury. In any event, the extent of permanent partial general disability shall not be less than the percentage of functional impairment . . . . An employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee is engaging in any work for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury."

Prior to the legislative changes in 1993, K.S.A. 1992 Supp. 44-510e(a) provided a different formula for determining work disability:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced, taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general disability shall not be less than the percentage of functional impairment. . . . There shall be a presumption that the employee has no work disability if the employee engages in any work for wages comparable to the average gross weekly wage that the employee was earning at the time of the injury."

Interpretations of statutory provisions are questions of law over which appellate courts have unlimited review. While an appellate court gives deference to the Board's interpretation of the law, if such interpretation is applied erroneously, the court may grant relief. *Pruter v. Larned State Hosp.*, 271 Kan. 865, 868, 26 P.3d 666 (2001).

In *Watkins*, 23 Kan. App. 2d 837, Watkins was injured but returned to work and performed the same work for the same wage. Watkins lost his job when the store was sold. This court found that Watkins was not entitled to work disability benefits. 23 Kan. App. 2d at 839-40. The court stated that an accommodated job artificially avoids work disability by allowing the employee to retain the

ability to perform work for a comparable wage, and that once an accommodated job ends, the presumption of no work disability may be rebutted. 23 Kan. App. 2d at 838-39. See also *Lee v. Boeing Co.*, 21 Kan. App. 2d 365, Syl. ¶ 3, 899 P.2d 516 (1995) (employee in accommodated position laid off for economic reasons awarded work disability)

However, the *Watkins* court commented on the situation where an employee returns to the same job *without accommodation*: Watkins apparently was able to return to his former work load.

"If following an injury an employee is physically able to return to work, perform his or her job duties without special accommodation, and earn a wage comparable to his or her pre-injury wage, then by definition that employee does not have work disability. See K.S.A.1992 Supp. 44-510e(a). If the employee subsequently loses the job for economic or other reasons, the loss of employment cannot by itself create a work disability, absent a change in the employee's physical condition." 23 Kan. App. 2d at 839.

Case argues the Board erroneously focused on the work disability provisions of K.S.A. 44-510e(a) and failed to address the more specific provision that disqualifies work disability claims where the claimant is earning 90% or more of the preinjury wage. Case's argument does not give credence to the rule in *Lee* that once an employee stops earning 90% of their preinjury wage, he or she may be entitled to work disability.

The Board found Tallman's claim similar to those of the claimant in *Gadberry*, 25 Kan. App. 2d 800. There, the claimant returned to work in an *unaccommodated* position after her injury and surgery to repair a herniated disk. She was terminated a month later. The employer maintained the termination was necessary because it had relocated the claimant's department. After unsuccessfully finding employment, the claimant was awarded 50 percent work disability, based on the average of 100% wage loss and 0% task loss. Several factors were included in the wage loss, namely claimant's age was 57 years old with significant functional disability and no other work experience, she was unable to find other work, and her inability to return to work for the employer. In awarding work disability, the *Gadberry* court found the claimant's termination was highly suspicious. See 25 Kan. App. 2d at 806-07.

The Board's reliance on *Gadberry* is not particularly persuasive in light of the Board's finding that Tallman returned to a situation identical to an accommodated position. *Gadberry* involved an employee who was terminated under the auspices of relocating the employee's department but, in reality, probably due to her advanced age. Here, Tallman's termination was purely economic in nature and done in terms of seniority.

Case also argues the Board's analysis incorrectly interprets the Workers Compensation Act by failing to require a causal nexus between the claimant's reduced wages and his or her compensable injury before work disability is available. Case argues the Board is treating work disability as the rule when an employee's wages falls below the 90% level in K.S.A. 44-510e(a) and the limitation of awarding functional impairment as the exception.

Case cites *Hernandez v. Monfort, Inc.*, 30 Kan. App. 2d 309, 41 P.3d 886, *rev. denied* 274 Kan. 1112 (2002). Hernandez was injured on the job and underwent surgery. He returned to work with restrictions but continued to earn an hourly rate of pay that was never less than 90% of his preinjury hourly rate. However, when Hernandez returned to work, Monfort had eliminated overtime and consequently his hours and average weekly wage were reduced. The *Hernandez* court agreed with the Board that Hernandez had not proven a connection between his injury and the fact that he then earned less than 90% of his preinjury gross average weekly wage. The court stated: "[T]here was substantial competent evidence to support the Board's finding that Hernandez' wage loss was based on Monfort's business decision to eliminate overtime. As such, the Board had evidence to support its finding that Hernandez was not entitled to work disability." 30 Kan. App. 2d at 312.

Case argues the present case falls in line with *Hernandez* because the only material difference is that Monfort chose to reduce its generous amounts of overtime, while the economic conditions caused Case to reduce the workload and ultimately to lay off employees including Tallman. Case argues its layoff of Tallman does not trigger an entitlement to work disability any more than the decrease in overtime did in *Monfort*.

We disagree with this analysis. The issue here is not the amount of wages being earned at the time, whether due to extensive overtime or not. The issue is the worker's capacity to do his or her job. The coincidental decrease in the amount of work per shift does not change the central issue.

Once Case terminated Tallman, his work disability came to fruition and he was entitled to an appropriate award. Case does not challenge the Board's calculation of Tallman's disability award, only his entitlement to it. Since Tallman returned to work in a situation identical to an accommodated position and it is unclear whether he would have been able to perform his preinjury position, *Watkins* is not applicable. Consequently, the Board's decision to award Tallman work disability is affirmed.

Several cases have addressed the 1993 changes in computing permanent partial disability benefits. In *Sharp v. Custom Campers, Inc.*, 31 Kan. App. 2d 772, 74 P.3d 42 (2003), the claimant worked as a buffer in the company's fiberglass repair division. After her injuries, she was restricted from any buffing and returned to an accommodated position. She was laid off a year later because of economic conditions. The *Sharp* court upheld the Board's awarding of permanent partial disability benefits pursuant to the current version of K.S.A. 44-510e(a) and distinguished *Watkins*:

> "Custom Campers' reliance on *Watkins* ignores the statutory amendments which now place the focus on a claimant's actual wage loss in lieu of the claimant's ability to earn wages. Further, an employee in an accommodated position can be eligible for work disability, even if discharged as part of an economic layoff, if the employee cannot earn the same wage elsewhere. See *Lee v. Boeing Co.*, 21 Kan. App. 2d 365, 372, 899 P.2d 516 (1995)." 31 Kan. App. 2d at 776.

The *Sharp* court concluded that since the claimant returned to an accommodated position with Custom Campers, she was eligible for work disability, notwithstanding her economic layoff. 31 Kan. App. 2d at 776-77.

In *Helmstetter v. Midwest Grain Products, Inc.*, 29 Kan. App. 2d 278, 28 P.3d 398 (2001), the claimant was injured in an explosion while on the job and returned to work in the same position. Claimant testified that after returning to work, he quit because he was stressed, nervous, and scared and the feelings would not go

away. The Board found claimant left work due to his work injury, acted in good faith in leaving, that post-traumatic stress disorder (PSTD) prevented claimant from returning to the plant, and that the claimant was entitled to work disability. The *Helmstetter* court held there was substantial competent evidence to support the Board's finding that claimant acted in good faith in leaving his job because of the PTSD. 29 Kan. App. 2d at 280. The court also rejected the employer's argument that claimant was not entitled to work disability because he demonstrated he retained the ability to perform his preinjury job and *Watkins* would prevent work disability. The court distinguished *Watkins* by stating that the claimant left his job because of the injury, while Watkins left due to economic conditions. 29 Kan. App. 2d at 280. The court also stated:

"Further, *Watkins* involved a different definition of work disability. The former version of K.S.A. 44-510e involved an ability test both as to jobs and wages, and *Watkins* is premised on that ability test.

"Currently, ability or capacity to earn wages only becomes a factor when a finding is made that a good faith effort to find appropriate employment has not been made. [Citation omitted.] Once a finding has been made that the claimant has established a good faith effort, the difference in pre-and post-injury wages can be based on the actual wages made. [Citation omitted.]" 29 Kan. App. 2d at 281.

The court in *Gadberry v. R.L. Polk & Co.*, 25 Kan. App. 2d 800, 975 P.2d 807 (1998), as addressed above, faced a situation where the employee returned to the same job for the same wage as prior to her injuries and the *Watkins* rule would seemingly control. The *Gadberry* court stated there was no evidence of any accommodation to a light-duty job by the employer. The court in *Gadberry* focused on the 1993 changes to the computation for determining work disability in K.S.A. 44-510e in order to get around the *Watkins* rule:

"To arrive at a fair and accurate assessment of the effect of work-related injuries, the Kansas Legislature has, throughout the life of the Workers Compensation Act, considered several compensatory theories. This court reviewed the legislative evolution of the work disability concept in *Lee v. Boeing Co.*, 21 Kan. App. 2d 365, 368-71, 899 P.2d 516 (1995). Although various formulas have been adopted in an effort to ascertain a fair measurement of a worker's disability, prior to 1993, the formulas were primarily based on the concept of compensation for the loss of abilities—the ability to earn wages and/or the ability to perform work. For various

reasons, measuring disability compensation by the loss of abilities resulted in concerns about increased litigation and higher insurance premiums. Therefore, in 1993, the Kansas Legislature introduced a new factor into the equation—actual wage loss. The new two-part test for finding and measuring work disability includes both a measurement of the loss of ability to perform work tasks and actual loss of wages resulting from the worker's disability." *Gadberry*, 25 Kan. App. 2d at 802-03.

A recent case of this court to address work disability is *Newman v. Kansas Enterprises*, 31 Kan. App. 2d 929, 77 P.3d 492 (2002). In *Newman*, the claimant was a manager and supervisor for the employer. The claimant injured himself in a couple of work-related accidents. However, the claimant did not dispute that he returned to his usual duties and tasks and required no job accommodation. The claimant was terminated a year after his accident. The employer testified the termination was for lack of sales, speeding tickets, complaints, inappropriate sexual comments, and for driving under the influence in a company vehicle. The claimant maintained the termination was in retaliation for his injury time off work and to decrease the payroll to make the business look more attractive to potential buyers. The ALJ and the Board found the claimant had no work disability and was limited to his functional impairment rating.

The *Newman* court discussed *Lee* and *Gadberry* and found both distinguishable. The *Newman* court relied on *Watkins* in holding the claimant was not entitled to work disability beyond his functional impairment. The court stated that like the claimant in *Watkins*, Newman returned to work after his injuries and performed the same tasks for the same pay and there was substantial competent evidence in the record to support that Newman was terminated for his poor work performance and not his injuries. 31 Kan. App. 2d at 931-33.

It is clear that in certain situations, *Watkins* is still good law notwithstanding the 1993 changes. However, unusual factual situations may make *Watkins* inapplicable, even when there has been no apparent wage loss.

Affirmed.